R. Christian Haufler, Jr., trustee,[1] vs. Thomas Zotos
& another.[2]

Plymouth. December 6, 2005. - April 12, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Agency,* Scope of authority or employment. *Contract,* Offer and acceptance,
Validity. *Real Property,* Conveyance, Deed. *Deed,* Delivery. *Massachusetts
Civil Rights Act. Civil Rights,* Availability of remedy.

An escrow agreement between the plaintiff and the defendants concerning the
    transfer of title of a portion of the plaintiff's land to the defendants was
    enforceable, where there was ample evidence in the record to support a
    finding that the agreement was made by an agent of the defendants acting
    with actual authority [497-498]; where the absence of the defendants'
    timely signatures did not prevent the formation of the contract [498-499];
    and where the plaintiff's execution of the escrow agreement and
    performance of its terms was convincing evidence of the plaintiff's ac-
    ceptance of the agreement as written [499-501]: thus, delivery of the deed
    in accordance with the escrow agreement effectively transferred title to the
    defendants [501].
This court concluded that the defendants in a civil action, through their
    repeated trespasses on the plaintiff's land and harassment of the plaintiff,
    his neighbors, and workers whom the plaintiff had hired to work on his
    property, had violated the Massachusetts Civil Rights Act, G. L. c. 12,
    §§ 11H-11I, by interfering through threats, intimidation, or coercion with
    the plaintiff's right to use and enjoy his land. [501-508]

Civil action commenced in the Land Court Department on
October 26, 1999.

After transfer to the Superior Court, the case was heard by
*Charles J. Hely,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*J. Gavin Cockfield* for the plaintiff.

*Robert E. Kelley* for the defendants.

Marshall, C.J. This case arises out of a property dispute

---

[1]Of the Conservation Realty Trust.
[2]Nancy Zotos.

between R. Christian Haufler and Thomas and Nancy Zotos (collectively, Zotos),[3] who own land adjacent to each other along the North River in Marshfield (town). At issue is whether an escrow agreement between Haufler and Zotos concerning transfer of title of a triangular portion of Haufler's land to Zotos is enforceable, and whether delivery of the deed effectively conveyed title to Zotos. Haufler claims that ownership of the triangular parcel is essential to his plans to construct a new house on his property under the town's applicable zoning bylaws,[4] and that the terms of the escrow agreement, executed by Zotos some fifteen months after Haufler had signed it, did not reflect their agreement. Also at issue is whether Zotos violated the Massachusetts Civil Rights Act (act), G. L. c. 12, §§ 11H-11I,[5] by interfering through "threats, intimidation or

[3]Haufler initially filed suit against Thomas Zotos. His subsequent motion for compulsory joinder of a necessary party to add Nancy Zotos as a defendant was allowed. For ease of reference we refer to the defendants Thomas and Nancy Zotos collectively as Zotos. Where necessary to the factual discussion, we refer to them by their individual names.

[4]A copy of the town's zoning bylaws is not included in the record. The record contains a letter from the town's zoning code enforcement officer to the zoning board of appeals explaining that an existing "dwelling unit" on the triangular parcel "was the basis under . . . the Zoning By-laws [for] the original Building Permit." Because, he said, the deed at issue conveyed the triangular parcel with the existing dwelling on it to Zotos, "the Building Department no longer feels" that Haufler's property "will qualify for a Building Permit."

[5]General Laws c. 12, § 11H, provides in pertinent part:

"Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief . . . ."

General Laws c. 12, § 11I, provides in pertinent part:

"Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages."

coercion" with Haufler's right to use and enjoy his property.

After a trial before a judge in the Superior Court, the judge ruled that the escrow agreement was enforceable, delivery of the deed was effective to convey title, and Zotos did not violate the act.[6] We affirm the judge's order with respect to the escrow agreement and validity of the deed. We vacate his order with respect to the civil rights claim.

1. *Procedural background.* In October, 1999, Haufler commenced an action in the Land Court against Zotos challenging the validity of a deed transferring title of a triangular portion of land he owned in Marshfield to Zotos. Haufler also claimed that Zotos interfered with his constitutional right to use and enjoy his property by threatening to "oppose construction on any portion" of his land, and by recording the deed to the triangular parcel "in order to defeat [Haufler's] ability to construct the proposed residences," in violation of the act. Haufler subsequently moved for a preliminary injunction to enjoin Zotos's "continuing trespasses" on his property, which was allowed by a judge in the Land Court in November, 1999.

On Zotos's motion, the case was transferred to the Superior Court in October, 2000, pursuant to G. L. c. 211B, § 9. Some two years later, in September, 2002, Haufler filed a complaint for contempt, alleging that Thomas Zotos had violated the preliminary injunction entered in the Land Court.[7] In January,

---

[6]Haufler also brought breach of contract and trespass claims, and a claim for wilful trespass to trees under G. L. c. 242, § 7. Zotos counterclaimed that Haufler's clearance of trees and excavation of his property amounted to nuisance, that Haufler tortiously interfered with Zotos's contractual relations regarding their purchase of a neighboring lot, that they had rights to use Haufler's dock, and that Haufler violated the Massachusetts Civil Rights Act (act), G. L. c. 12, § 11I, by bringing his lawsuit against Zotos in order to prevent them from participating in the town's zoning board of appeals hearings.

The judge ruled in favor of Haufler on his tree cutting, contract, and trespass claims and awarded Haufler $21,950 in damages (with interest), $542.80 in costs, and $5,000 in attorney's fees. On a contempt claim, the judge found for Haufler and entered a permanent injunction against Zotos, enjoining them from "going upon or depositing anything upon" Haufler's land and from "harassing, following, or in any way interfering with any person who is on" Haufler's land. The judge dismissed Zotos's counterclaims, concluding they were not supported by the evidence. None of these rulings is at issue in this appeal.

[7]Haufler alleged that Zotos had "repeatedly trespassed" onto his property;

2003, a judge in the Superior Court held a two-day trial on the contempt complaint, vacated the preliminary injunction issued by the Land Court, and issued a new preliminary injunction.[8] In March, 2003, the same judge held a bench trial on Haufler's remaining claims. In a comprehensive memorandum and order, the judge concluded that the escrow agreement was enforceable against Haufler and that the deed to the triangular parcel had been properly recorded by Zotos; he entered a declaratory judgment to that effect, stating that Haufler "does not own or have any legal right, title or interest in the triangular parcel." The judge further concluded that Haufler's claim under the act failed because the collective conduct of the defendants did not constitute "threats, intimidation or coercion" within the meaning of the act. Haufler appealed,[9] and we granted his application for direct appellate review.

2. *Factual background.* We summarize the facts as found by the judge, supplemented by undisputed facts from the record. In May, 1995, Haufler purchased a 6.7-acre L-shaped parcel of land on Littles Lane in Marshfield (Lot C) from Ralph and Kathleen Campanelli (collectively Campanelli), and in September, 1995, Campanelli transferred to Haufler a building permit they had previously obtained for the lot. Lot C is heavily wooded and is bordered on the north by the North River and

"intimidate[d] and harass[ed] surveyors present to perform work that is necessary to prepare for the trial of this action"; "routinely parked his vehicle . . . on Easement D in an apparent attempt to preclude other vehicles from passing onto [Haufler's property]"; "placed saw horses across [the road]"; "[i]n his vehicle, [Zotos] tailed" a neighbor (a friend of Haufler) and the neighbor's children "in an attempt to intimidate them"; placed "trash barrels," "lawn chairs," "construction debris," and "other household accoutrements" on Haufler's property; "installed boxes containing electronic antennas and photography equipment on several trees located on [Haufler's property]"; and "tampered with the tires of a trailer located on the [Haufler's property], rendering those tires inoperable."

[8]The second preliminary injunction enjoined Zotos, with two minor exceptions, from, among other things, "going upon or depositing anything upon [Haufler's land]" and from "harassing, following, or in any way interfering with any person who is on [Haufler's land]."

[9]The judge's memorandum and order was entered on April 25, 2003. On June 9, 2003, Zotos filed a "notice of intent to appeal" from that judgment. An amended judgment entered on June 19, 2003. On July 2, 2003, Haufler filed a notice of appeal from the amended judgment. Zotos did not take an appeal from that judgment, and raises no issues with respect to either judgment.

conservation land administered by the National Audubon Society. At the time of Haufler's purchase, no house had been built on Lot C, but there were two buildings on the lot, a "cottage" and a "garage."[10] The cottage is situated on a small triangular parcel that extends from the eastern border of Lot C into the adjacent lot, Lot D. The judge found that Haufler planned to obtain a new residential building permit for Lot C on the theory that the cottage located on the triangular parcel constituted a preexisting residential structure that would entitle him to such a permit. Haufler planned to obtain the permit, pour his foundation, and then demolish the cottage.[11] Once this was accomplished, Haufler was prepared to convey the triangular parcel to the owner of Lot D.

At some point Haufler, Campanelli, and the then-owner of Lot D, Aldro French, entered into an agreement (Campanelli agreement) concerning the triangular portion of Lot C.[12] Haufler (identified as "the buyer") agreed that "upon obtaining a building permit to build which shall be applied for immediately," he would "remove the existing cottage and shed within seventy-five (75) days of purchase" and would convey to French "the triangular piece of property on which the [cottage] and [shed] presently exist." The stated purpose of the Campanelli agreement was "to continue the easterly sideline of the premises to be sold [by French] in a straight line."

Thereafter, on January 29, 1996, French executed a purchase and sale agreement with Zotos for the purchase of Lot D-1.[13] The premises described in the French-Zotos purchase and sale

---

[10]The plan of land contained in the record reflects that there are three structures on Lot C: a "building," a "cottage," and a "shed." Based on several witnesses's references during trial to a "garage," we infer that the references are to the structure labeled "building" on the plan. References at trial to the "shed," taken in context, appear to be references to the structure marked "cottage" on the plan. During his testimony Haufler clarified that his references to "shed" were to the structure on the plan labeled "cottage," and that the plan's "shed" is a "small, little corn bin."

[11]Haufler had plans to subdivide Lot C into two parcels, build a house on each, and sell one to cover the cost of building his own house. According to Haufler, if he subdivided Lot C into two lots, the "cottage" would serve as the preexisting structure on one parcel, and the "garage" would serve the same purpose on the second parcel.

[12]The copy of the agreement in the record is not dated.

[13]French apparently had subdivided Lot D into two parcels, Lot D-1 and

agreement included the "triangular shaped parcel of land," although at the time Haufler had not conveyed title of that parcel to French as contemplated by the Campanelli agreement. Zotos retained an attorney, Steven Graham, to represent them at the closing, which was set for May 15, 1996.

As the closing date approached, Haufler still had not conveyed the triangular parcel to French. Because Zotos did not wish to rescind the purchase and sale agreement with French, they authorized Graham, as the judge found, "to make appropriate binding agreements on their behalf to obtain title to the triangle consistently with their purchase and sale agreement." Graham thereupon obtained for Zotos an assignment of French's rights under the Campanelli agreement. In anticipation of the French-Zotos closing, in early May, 1996, Graham telephoned Haufler to negotiate an agreement to the effect that Haufler would execute the deed to the triangular parcel, and Graham would hold the deed in escrow for Zotos. He then sent a letter to Haufler "to confirm the agreement" reached during the telephone conversation. The letter stated that Graham required from Haufler (in time for the closing still scheduled for May 15, 1996) a plan of the triangular parcel suitable for recording; a deed to the parcel; and a mortgage on the lot to be recorded at the time of closing "for the full performance of all undertakings in the agreement listed below." The letter further stated that Graham would prepare and send to Haufler for his signature: (1) an "agreement to convey the [triangular] property upon the start of construction on [Haufler's] property and to move the [cottage] currently located on the property to my client's property"; and (2) an agreement "to [e]scrow the amount of $5,000 to cover the expenses of moving the [cottage[14]] onto my client's property."

Graham then prepared and sent to Haufler an escrow agreement dated May 14, 1996, to be executed by Haufler and Zotos,

D-2. The triangular parcel of Lot C extended into Lot D-1. The judge found that the small, unoccupied cottage situated on the triangular parcel was a short distance from the house on Lot D-1, "so close as to appear to be in the yard of the main house." In addition to straightening the western lot line of Lot D-1, acquisition of the triangular parcel would give the owner of Lot D-1 control over the cottage.

[14]See note 10, *supra*.

which, the judge found, Graham drafted to accommodate the interests of both parties "consistently with his discussions" with Haufler.[15] The escrow agreement began with a series of recitals concerning the rights of Zotos to the triangular parcel under the purchase and sale agreement with French, and Haufler's need for the triangular parcel to accomplish his building permit objectives. The agreement then provided that Haufler would execute a deed to Zotos for the triangular parcel to be held in escrow by Graham and not recorded "until the occurrence of the events described in paragraphs 2 or 3, whichever occurs the earliest." Paragraph 2, in turn, stated that Zotos would record the deed on "the commencement of construction on the dwelling" on Haufler's land.[16] Paragraph 3 stated that Zotos "shall be entitled to record the deed . . . on or after August 30, 1996, notwithstanding the failure of Haufler to commence construction prior to that time."[17] Haufler signed the agreement, which had not yet been signed by Zotos, and had his signature notarized on May 14, 1996. The following day he sent the signed escrow agreement to Graham together with $5,000, the mortgage, and two signed and notarized deeds[18] for the triangular parcel of Lot C.[19] The closing occurred, Zotos

[15]At trial Haufler testified that he agreed to have the deed to the triangular parcel held in escrow "as long as it was understood that . . . the deed couldn't be recorded because the deed was essential for [him] to have the right to build a foundation [for his house]."

[16]The escrow agreement defined "commencement of construction" as "the pouring of the foundation for the dwelling to be constructed on [Haufler's land]."

[17]The escrow agreement also required that Haufler grant a mortgage on Lot C-1, see note 20, *infra*, to secure performance of the terms of the agreement. The escrow agreement further required Haufler to place $5,000 in escrow to ensure conveyance of the triangular parcel in accordance with the agreement, and permitted the use of the $5,000 to cover the cost of tearing down the cottage if necessary, and to cover up to $2,000 of the cost of moving the cottage if Zotos elected to move it rather than tear it down.

[18]One deed "was just metes and bounds," and one "referenced a plan to be recorded at the same time." Haufler testified that he did not send Graham a copy of the plan of the triangular parcel, which the deed referenced and which Graham had requested, because he claimed Graham had agreed that Haufler would complete the plan once he had poured the foundation for his house.

[19]Haufler testified that he sent the documents to Graham by facsimile and by courier. The cover sheet of the facsimile contains a notation: "Here are

obtained title to Lot D-1, but as we describe below, Zotos did not sign the escrow agreement until some fifteen months later.

Haufler encountered unanticipated delays because of his plans to subdivide Lot C, which in turn stalled commencement of any construction on his land. According to the town's zoning code enforcement officer, by subdividing Lot C into Lots "C-1" and "C-2,"[20] Lot C-1 was essentially rendered "nonconforming" because it did not have sufficient frontage on Littles Lane. For this reason, on July 10, 1996, the town rescinded the original (Campanelli) building permit for Lot C.[21]

By August 30, 1996, the date provided in the escrow agreement, Haufler had not obtained a new building permit, much less started construction of his house. The date passed without Zotos pressing the matter, and Haufler continued to pursue his plans to subdivide Lot C and to build a house on each subdivided lot. In April, 1997, while his appeal from the town's rescission of the original building permit for Lot C was pending, see note 21, *supra*, Haufler applied for new building permits for Lots C-1 and C-2, respectively. He also installed a well and had septic plans drawn up for each parcel.

It was during this period that Zotos began actively to oppose Haufler's building plans. Zotos came to believe that the original issuance of a building permit for Lot C had not been legal because the cottage on the triangular parcel had not been occupied and was therefore not a preexisting residential structure. Zotos's opposition to Haufler's plans for building two new houses on his property increased when the town indicated that this might require paving Littles Lane. During the spring or summer of 1997, Haufler's building permit applications for

copies of sign[ed] deed for escrow & [mortgage] on C-1. Deed to be put on record after foundation put in per agreement."

[20]Lot C-1 essentially comprised the vertical portion of the L-shaped Lot C and included the triangular portion to be conveyed to Zotos. Lot C-2 was the horizontal portion of Lot C.

[21]Haufler apparently appealed from the town's decision to the State building code appeals board. The State building code appeals board overturned the town's decision, and the town appealed. In the meantime, on July 23, 1996, Zotos agreed to a ninety-day extension of the deadline under the Campanelli agreement. No extension of the escrow agreement, however, was requested by Haufler or granted by Zotos. No issues with respect to the Campanelli agreement are raised on appeal.

Lots C-1 and C-2 were denied, and Haufler appealed to the town's zoning board of appeals (board). As an abutter, Zotos was notified of the public hearing on Haufler's applications, scheduled for September, 1997.

In August, 1997, nearly one year after August 30, 1996, the date contained in the escrow agreement, Zotos signed the escrow agreement, and Graham, after some hesitation, gave Zotos the deed to the triangular portion of Lot C. Unbeknownst to Haufler the deed was recorded by Zotos on August 18, 1997. The following month at a hearing before the board on Haufler's building permit applications for Lots C-1 and C-2, Nancy Zotos informed the board that Haufler no longer owned the triangular parcel. Because he then had no basis for obtaining his building permits, Haufler withdrew his applications.

3. *Enforceability of the escrow agreement.* The judge concluded that the delivery by Haufler to Graham of the signed escrow agreement, two deeds to the triangular parcel, the mortgage, and the sum of $5,000 "amounted to acceptance" by Haufler of Zotos's "offer as expressed in the written contract." Accordingly, he ruled that the escrow agreement was enforceable against Haufler, and the deed conveyed title to Zotos.

On appeal, Haufler disputes the enforceability of the escrow agreement for three reasons. First, Haufler contends that express authority was required for Graham to bind Zotos in contract, see *See* v. *Norris*, 234 Mass. 345, 348-349 (1920), and that Graham was not so authorized.[22] See *Rossi* v. *School Comm. of Everett*, 354 Mass. 461, 464 (1968). The argument fails. Author-

---

[22] At trial, Haufler claimed simply that Graham did not have the "authority" to bind Zotos. On appeal, Haufler argues for the first time that Graham did not have either actual or apparent authority. There is no basis for a finding of apparent authority in this case, and the judge made no such ruling. Apparent authority involves "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Neilson* v. *Malcolm Kenneth Co.*, 303 Mass. 437, 441 (1939). See *Globe Ticket Co. of New England* v. *Boston Retail Grocers' Ass'n*, 290 Mass. 235, 238 (1935); Restatement (Second) of Agency § 8 (1958). Throughout the negotiation and execution of the escrow agreement, Haufler spoke only to Graham. Thomas Zotos did testify that Haufler telephoned him to discuss the triangular parcel, and that he told Haufler that he was "willing to wait" until Haufler "could do what he could do" with respect to "orchestrate building a house." There was no evidence that Thomas Zotos

ity is "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) of Agency § 7 (1958). See Restatement (Third) of Agency § 2.01 (Tent. Draft No. 2) ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act"). See also *Theos & Sons* v. *Mack Trucks, Inc.*, 431 Mass. 736, 743-744 & n.13 (2000) (discussing express and implied authority). There is ample evidence in the record to support the judge's finding that Zotos gave Graham the authority to "make appropriate binding agreements on their behalf to obtain title to the triangle."[23] See Restatement (Second) of Agency, *supra* at § 12 comment a, at 57 (exercise of agent's power to alter legal relations between principal and third persons "may result in binding the principal to a third person in contract"). Certainly his finding is not clearly erroneous.

Next, Haufler argues that the escrow agreement was not enforceable because Zotos did not manifest his acceptance of the agreement by signing it within a reasonable time.[24] A written contract, signed by only one party, may be binding and enforceable even without the other party's signature if the other

---

made any representation to Haufler touching on Graham's authority to act on Zotos's behalf.

[23]Thomas Zotos testified that he gave Graham "[f]ull authority" to negotiate for Zotos's interests regarding the triangular parcel. He was impeached with testimony from his deposition, at which he was asked, "Did you give Attorney Graham authority to enter into an agreement on your behalf?" At his deposition, Thomas Zotos answered, "No." The judge credited Thomas Zotos's trial testimony, and we see no reason to disturb this finding. "A judge who has seen and heard the witnesses is in a better position to determine their credibility than is a court which is confined to the printed record." *Berry* v. *Kyes*, 304 Mass. 56, 57 (1939). Moreover, Haufler's and Graham's testimony amply support his conclusion. For example, Graham testified that Zotos "asked [him] to prepare an agreement . . . so that they could get title to the [triangular parcel] at some point." Haufler testified that Graham called him to discuss the triangular parcel and "said that he was going to represent [Zotos]."

[24]Haufler points to Graham's testimony that he intended the escrow agreement to be accepted by Zotos through their execution of the agreement. Contrary to Haufler's claim, Graham did not testify that a contract would be formed "only" when Zotos accepted the document by executing it.

party manifests acceptance. See *Putnam Mach. Co.* v. *Musta-kangas*, 236 Mass. 376, 378 (1920) (although only defendant signed contract, plaintiff could still recover for breach where plaintiff "assented to and accepted" contract). See also 2 S. Williston, Contracts § 6:43, at 467-469 (4th ed. 1991) ("any written contract, though signed by only one party, will bind the other if he accepts the writing"). Cf. *Bartlett* v. *Boston*, 182 Mass. 460, 462-463 (1903) (defendant city bound by terms of deed where there was evidence of acceptance of deed by city, although city commissioners who drew up and signed deed were not agents of city). The escrow agreement by its terms did not require Zotos's signature to be effective. Moreover, Graham assented to the escrow agreement on behalf of Zotos by holding the deeds, mortgage, and sum of $5,000 in escrow until the deadline specified in the escrow agreement had passed. See *Kaarela* v. *Birkhead*, 33 Mass. App. Ct. 410, 412-413 (1992) (in absence of formal escrow agreement, letters between attorneys established terms of escrow agreement, and escrow agent's deposit of funds constituted acceptance of terms recited in correspondence). By not recording the deed until one year after August 30, 1996, Zotos performed within the terms of the agreement. The judge was correct to conclude that the "absence of signatures by [Thomas and Nancy Zotos] did not prevent the formation of the contract."

Finally, Haufler claims that his execution of the escrow agreement was an offer, not an acceptance. Haufler points to his trial testimony concerning a conversation he had with Graham after he had sent Graham the executed escrow agreement to the effect that they agreed the deed would not be recorded until Haufler had poured the foundation for a new house. This, he claims, amounted to a withdrawal of his original offer (the executed escrow agreement), which could no longer be accepted by Graham on behalf of Zotos.[25] This argument is also unavailing.

An offer is a "manifestation of willingness to enter into a

---

[25]In the Superior Court Haufler argued that his notation on the facsimile cover sheet delivered with the escrow agreement and deeds, see note 19, *supra*, substantially varied the terms of the escrow agreement and, therefore, was not a binding acceptance but rather a counteroffer. See *Massachusetts Hous. Fin. Agency* v. *Whitney House Assocs.*, 37 Mass. App. Ct. 238, 241 (1994). See also *Moss* v. *Old Colony Trust Co.*, 246 Mass. 139, 148 (1923)

bargain," Restatement (Second) of Contracts § 24 (1981), and is often a "conditional promise dependent for its enforceability on the offeree giving in exchange the offeror's requested act," 1 S. Williston, Contracts § 4:4, at 266 (4th ed. 1991). On behalf of Zotos, Graham initiated discussions with Haufler and proposed the terms of an escrow agreement. As consideration, Zotos offered more time for Haufler to obtain a building permit in exchange for his executing a deed and placing it in escrow.[26] The delivery of the signed escrow agreement, together with two signed and notarized deeds, a mortgage on his property, and the sum of $5,000 to Graham belies any argument that Haufler was making an offer rather than accepting an offer. The judge correctly concluded that Haufler's performance of the conditions that conformed to the terms of the written escrow agreement "was convincing evidence" of Haufler's acceptance of the agreement as written.

Haufler has maintained throughout the litigation that the escrow agreement he signed was but a draft, the terms of which had not been fully determined. See *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935) (failure to agree on material terms may be evidence that parties do not intend to be presently bound). He and Graham "never" discussed "any time

("a conditional acceptance or one that varies from the offer in any substantial respect is in effect a rejection and is the equivalent of a new proposition"). The judge rejected this claim, concluding that Haufler's notation on the facsimile cover sheet amounted to no more than a "hedged acceptance." See *Massachusetts Hous. Fin. Agency* v. *Whitney House Assocs., supra* ("A comment, purported clarification, or expression of dissatisfaction appended to an endorsement of acceptance . . . [is] in the category of 'grumbling acceptances,' acceptances made without enthusiasm but acceptable nonetheless"). The argument is not pursued on appeal and is waived.

[26]There is no question, nor could there be, of consideration for the escrow agreement. When Zotos purchased Lot D-1 from French, they acquired the right to enforce the Campanelli agreement as assignees, see Part 2, *supra*. It appears that Haufler might have been in breach of the Campanelli agreement, but the agreement is ambiguous. It gave Haufler seventy-five days after purchase of Lot C to convey the triangular parcel to French, but its language also implies that Haufler would convey the triangular parcel to French on obtaining a building permit, see note 12, *supra*. In any event, Zotos was willing to accommodate Haufler's need for the triangular parcel, see note 22, *supra*, rather than sue for specific performance. See *Currier* v. *Howard*, 14 Gray 511, 513 (1860) (assignee of written contract to convey land entitled to maintain action for specific performance).

requirements," he said, and the August 30, 1996, date contained in the escrow agreement was not a negotiated term: it would have been "impossible" for him to start construction on his house by August 30, 1996, he argues, because of the building permit appeals process.

Haufler also testified, however, that he did not "really" read all of the provisions of the escrow agreement, but "scann[ed] the agreement" before signing it and sending it back to Graham. Haufler may well have overlooked the August 30, 1996, date, but that provides him with no legal comfort. "The general rule is, that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not." *Wilkisius* v. *Sheehan*, 258 Mass. 240, 243 (1927). The inclusion of the August 30, 1996, date in the escrow agreement may have differed from Graham's May 9 letter to Haufler. But as the judge noted, Haufler is "an attorney of considerable experience and skill." Had he intended to reject the term providing for an August 30, 1996, cutoff date, "he would not have signed the written contract without making a written modification on the contract itself." The judge was correct to conclude that the escrow agreement was binding and enforceable.

Our conclusion to this effect disposes of Haufler's claims that, if the escrow agreement is not enforceable, delivery of the deed to Zotos was ineffective to convey title. We now turn to Haufler's civil rights claim.

4. *Civil rights claim.* We first describe the facts that form the basis of Haufler's claim under the act. At varying times after they recorded the deed, Zotos, as the judge found, engaged in a "long train of complaints and objections" about Haufler and other neighbors, including letters to local, State, and Federal officials, some of which, in the judge's words, "raised legitimate issues under applicable zoning laws" and "[m]any" of which were "frivolous or of little merit."[27] Several of Zotos's letters were general complaints about land use and development on Littles Lane and did not target Haufler in particular.

---

[27]Nancy Zotos addressed complaints to the town's zoning board of appeals, the town's planning board, the town's board of health, the town's historical society, the town itself, the North River Commission, the State Department of Environmental Protection, the Federal Environmental Protection Agency, and the United States Army Corps of Engineers.

In addition, the judge found that Thomas Zotos "engaged in abusive conduct" toward Haufler while Haufler was on his own property. The judge also found that Thomas Zotos "intentionally followed and harassed" a neighbor more than once while the neighbor was walking with his young children on Haufler's property. On one occasion Thomas Zotos pulled next to the neighbor in his car in what the neighbor described as "a threatening manner." On another, when Haufler arrived at his property, a sawhorse was blocking the dirt road on his land.[28] The driver of his automobile moved the sawhorse, whereupon Thomas Zotos "came running up the hill at the car and yelling" in what Haufler described as a "very aggressive" manner. When Haufler noted that he owned the property, Thomas Zotos responded that he did not care and that he was going to contact the police.

The judge also found that Thomas Zotos harassed individuals hired by Haufler to work on his land. In two separate incidents, Thomas Zotos "verbally insulted and harassed" a worker and later telephoned a police officer, falsely accusing the worker of trespassing on Haufler's land.[29] The judge also found that Thomas Zotos "verbally harassed and abused" a surveyor hired by Haufler to plot boundary lines and locate the stumps of cut trees. Thomas Zotos's abusive behavior continued even when the surveyor returned with a uniformed town police officer. At that point, Thomas Zotos called the surveyor and the officer "perverts," jumped up and down, wrongfully claimed they were on Zotos's property, and ordered them off the property shouting epithets and profanities.[30]

Haufler hired a real estate appraiser to document Zotos's encroachments on Haufler's property. As the appraiser approached Haufler's property, Thomas Zotos ran toward him with a rake, holding it "like present arms style . . . up in the

---

[28]The judge found that Thomas Zotos left the sawhorse blocking the dirt road on Haufler's land.

[29]The worker testified that he "felt that [Thomas Zotos] was trying to intimidate me into perhaps a physical altercation with him. . . . I felt threatened, very uncomfortable . . . ."

[30]The surveyor described Thomas Zotos's behavior as "like a bee coming out of a hive" and "a threatening thing." The police officer described Thomas Zotos's behavior as "irate" and "irrational."

air." The appraiser described Thomas Zotos as "very belliger-
ent, very aggressive." The appraiser returned later with a town
police officer. Thomas Zotos confronted the appraiser and the
police officer and was, in the appraiser's words, "extremely ag-
gravated, very insulting, and . . . talking at the top of his
voice." All of these incidents resulted in the workers Haufler
had hired leaving the property without completing the work
they had been hired to perform.

The judge further found that Thomas Zotos trespassed on
Haufler's land when he removed lot line markers placed by the
surveyor hired by Haufler. Thomas Zotos also placed "no
trespassing" signs and birdhouses on trees on or near Haufler's
property line. The judge found the birdhouses contained
electronic equipment that "may have been surveillance or video
equipment." He also found that Thomas Zotos had placed
"[n]ails and boards with nails in them" on the dirt road on
Haufler's land.[31] Finally, the judge found that Zotos "unlaw-
fully cut trees on [Haufler's] property near their common bound-
ary in the area approaching the river front." Haufler claims,
contrary to the judge's ruling, that all of this behavior, in addi-
tion to Zotos's recording of the deed, violated his civil rights
under the act.

First, he argues that the judge "incorrectly interpreted the act
by focusing his analysis on the conduct of the defendant that
was directed solely at [Haufler]." The judge should, he says,
have considered not only Zotos's actions directed at Haufler,
but also Zotos's behavior toward third parties. Contrary to Hau-
fler's claim, it is not at all clear that the judge concluded
otherwise.[32] Threatening, intimidating, or coercive actions
directed at third parties should be included in considering any

[31]In addition, the judge found Zotos placed children's tents, a canoe, trash
barrels, and markers for an electronic pet barrier on an easement on Haufler's
land. The judge found that the easement conveyed to Zotos by French included
only the right to park personal vehicles on the easement, and that the place-
ment of these objects on Haufler's land exceeded the scope of the easement.

[32]In the judge's discussion of Haufler's civil rights claim, he referred to
Thomas Zotos's "abusive conduct" toward the workers hired by Haufler and
his neighbor and stated that he is "[c]onsidering the [defendants'] conduct as
a whole . . . ." But the judge later stated in a footnote that "the totality of
the conduct" of Thomas and Nancy Zotos *directed toward Haufler* "did not
amount to threats, intimidation or coercion."

conduct that forms the basis of a claim under the civil rights act. Cf. *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 100 (1987) (no exemption for civil rights deprivations resulting from third-party pressure under the act); *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 92 (1999) (in context of coercion, actual or potential physical confrontation "may involve third persons" and "threat of harm need not be directed at the plaintiff"). See also *Bell* v. *Mazza*, 394 Mass. 176, 180 (1985) (threat to plaintiffs' contractor considered part of allegations supporting civil rights claim).

To evaluate Haufler's claim we therefore consider Zotos's entire conduct, separating it for ease of reference into three categories: (1) the recording of the deed to the triangular parcel allegedly in order to prevent Haufler from constructing a house on his property; (2) Zotos's repeated complaints to local, State, and Federal officials about Haufler's use of his land; and (3) Zotos's repeated trespasses on Haufler's land and harassment of Haufler, his neighbors, and workers whom Haufler hired to work on his property. We conclude that the recording of the deed and Zotos's complaints to various officials did not violate the act, but that the aggregate conduct described in the third category did.

To establish a claim under the act, Haufler "must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 717 (1989). Haufler easily establishes the first prong: the right to use and enjoy one's own property is constitutionally secured. See *Brett* v. *Building Comm'r of Brookline*, 250 Mass. 73, 77 (1924).

As to the second and third prongs, the Legislature enacted the civil rights act to provide "enhanced protection of civil rights" under State law at a time when "[d]eprivations of secured rights by private individuals using violence or threats of violence were prevalent . . . ." *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 821 (1985). We have recognized that the act was not intended to create a "vast constitutional tort," *Bell*

v. *Mazza, supra* at 182, and that the remedies under the act were "explicitly limited" to those situations "where the derogation of secured rights occurs by threats, intimidation or coercion." *Bally* v. *Northeastern Univ., supra* at 718, citing *Bell* v. *Mazza, supra* at 182-183. Nonetheless, the act is "entitled to liberal construction of its terms." *Buster* v. *George W. Moore, Inc.,* 438 Mass. 635, 645 (2003), quoting *Batchelder* v. *Allied Stores Corp., supra* at 822. See *Batchelder* v. *Allied Stores Corp., supra,* quoting 2A C. Sands, Sutherland Statutory Construction § 54.04, at 570 (4th ed. 1984) ("cases within the reason, though not within the letter, of a statute shall be embraced by its provisions").

We use a reasonable person standard to determine whether Zotos's conduct constituted threats, intimidation, or coercion under the act. See *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. 467, 474-475, cert. denied, 513 U.S. 868 (1994). In the context of the act, a "threat" consists of "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Id.* at 474. "Intimidation" involves "putting in fear for the purpose of compelling or deterring conduct." *Id.* "Coercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Buster* v. *George W. Moore, Inc., supra* at 646, quoting *Planned Parenthood League of Mass,, Inc.* v. *Blake, supra.* See also *Freeman* v. *Planning Bd. of W. Boylston,* 419 Mass. 548, 565 (1995), quoting Webster's New Third Int'l Dictionary 439 (1981) (defining "[c]oercion" under the act as "the use of physical or moral force to compel [another] to act or assent"). We clarified recently that the scope of coercion under the act is not limited to actual or attempted physical force. See *Buster* v. *George W. Moore, Inc., supra* at 646-648 (emphasizing "moral" force as a possible form of coercion, and holding that economic coercion standing alone, in certain circumstances, may be actionable under the act).

Applying those principles here, the thrust of Haufler's claim with respect to the deed is that Zotos's recording of the deed was calculated to impede Haufler's plans for constructing a house on his property. This is an allegation of a deprivation of

rights that is not coercive "because it is not an attempt to force someone to do something that person is not lawfully required to do." *Freeman* v. *Planning Bd. of W. Boylston, supra.* See *Swanset Dev. Corp.* v. *Taunton,* 423 Mass. 390, 396 (1996) ("To the extent that the plaintiffs allege that various delays were a deliberate attempt to frustrate their development plans, they have alleged a direct deprivation of rights rather than an attempt at coercion"). Zotos did not deprive Haufler of his right to build a house on his property; he was lawfully entitled to record the deed. Cf. *Buster* v. *George W. Moore, Inc., supra* at 648 (no economic coercion where defendants "lawfully entitled to foreclose" on plaintiffs' property). The town's zoning bylaws may prevent Haufler's development of his land; Zotos has not done so.

As to Zotos's "long train of complaints and objections" to various officials, the judge was correct to conclude that these did not represent threats, intimidation, or coercion within the meaning of the act. Words reasonably understood to express an intention to use lawful means to block development "would not be a threat, intimidation, or coercion actionable under § 11I." *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington,* 399 Mass. 771, 782 (1987). See *Sena* v. *Commonwealth,* 417 Mass. 250, 263 (1994) ("a threat to use lawful means to reach an intended result is not actionable under § 11I"); *Bell* v. *Mazza, supra* at 183 ("allegations which merely indicate that a defendant petitioned for the redress of grievances, absent extraordinary circumstances, are not sufficient to state a claim under G. L. c. 12, § 11I"). The judge's finding that only some of Zotos's letters "raised legitimate issues under applicable zoning laws" and that "[m]any" of them were "frivolous or of little merit" is tempered by the fact that most of the letters concerned general complaints about land use and development on Littles Lane and did not target Haufler in particular.[33]

Zotos's other conduct stands on different footing. A reason-

---

[33]In *Bell* v. *Mazza,* 394 Mass. 176, 183 (1985), we noted that "allegations which merely indicate that a defendant petitioned for the redress of grievances, *absent extraordinary circumstances,* are not sufficient to state a claim under G. L. c. 12, § 11I" (emphasis added). The judge correctly recognized as much in his memorandum and order: "The court must be cautious about finding a civil rights violation based on a citizen's exercise of the right to free

able person could have felt threatened or intimidated by some of the conduct of Thomas Zotos. Several of Haufler's workers and Haufler's neighbor testified that the defendant's behavior was "threatening" or that they felt "threatened" by him. Haufler and another worker described Zotos's behavior as "very aggressive." Thomas Zotos ran at one worker with a rake in hand, and threatened to telephone the police when the saw horse was moved from the dirt road so Haufler could drive across his own property. Even the presence of a police officer did not deter Thomas Zotos, who showed no intention of retreating from any confrontation and, on two separate occasions, forced a worker accompanied by a police officer off Haufler's property, shouting epithets. Zotos also telephoned the police to have an authorized worker removed for trespassing.[34]

The conduct here is similar, if not more egregious, than the conduct at issue in *Bell* v. *Mazza*, 394 Mass. 176, 183-184 (1985), where we held that the plaintiffs' allegations were sufficient to withstand the defendants' motion to dismiss, and *Ayasli* v. *Armstrong*, 56 Mass. App. Ct. 740, 753 (2002), where the Appeals Court held that the defendants' conduct violated the act. In *Bell* v. *Mazza, supra* at 179-180, the plaintiffs alleged that the defendants, in opposition to the plaintiffs' plans to construct a tennis court on their property, threatened to do anything at any cost to prevent the construction of the tennis court, formed an association of neighbors to that end, threatened to sue the plaintiffs' contractor, attempted to induce the electric company to discontinue electric service to the plaintiffs, physically blocked a plaintiff's passage onto the land, responded to her greeting with epithets, and contacted the police and fire departments several times concerning the construction on the plaintiffs' property. In *Ayasli* v. *Armstrong, supra* at 743-746, in addition to opposing the plaintiffs' development plans before

---

speech and to petition for the redress of grievances, even where the defendant's complaints are excessive in number and mostly meritless."

[34]Zotos's removal of boundary markers, placement of various objects on Haufler's land, and unlawful cutting of trees on Haufler's land sound more in trespass than threats, intimidation, or coercion, but can be considered as additional factors in the specific circumstances of this case as contributing to interference with Haufler's use and enjoyment of his property.

town boards, the defendants told the contractor working on the plaintiffs' house that they had a video camera and would be keeping track of the project, went onto the plaintiffs' property to take photographs, and had gates erected across the plaintiffs' deeded right of way over the defendants' land, forcing the plaintiffs to use an impassable route to access their property. In that case, the defendants' conduct "constitut[ed] persistent efforts to disturb the plaintiffs' enjoyment of their land, to impede access, limit use, and generally make [the plaintiffs] so uncomfortable . . . that they would abandon their plans for the house." Id. at 753. The same can be said of Zotos's conduct here.

The conduct on which we focus occurred after the recording of the deed, which was the key factor in thwarting Haufler's development plans. But the conduct did interfere with Haufler's right to use and enjoy his property. Haufler testified that he did not "drive down there much," had "avoided" going to his property in the latter part of 2002, and was "afraid" to go to his property. Zotos's abusive conduct also interfered with Haufler's ability to have workers (a surveyor, for example) come to his property. Zotos's conduct was persistent and antagonistic. Cf. *Rattigan* v. *Wile*, 445 Mass. 850, 852-853, 856-861 (2006) (in residential property dispute, unpleasant odors, sounds, and visual conditions on defendant's property were substantial and unreasonable interference with neighboring plaintiff's use and enjoyment of property and therefore constituted nuisance). Their behavior escalated beyond a property dispute into threatening belligerence and unprovoked hostility. On balance, and in light of our earlier discussion, we conclude that Zotos did violate the act.

We now turn to the question of remedy. In his complaint and on appeal, Haufler sought damages for the violation of his civil rights. Under the act, Haufler is entitled to injunctive relief and compensatory damages. See note 5, *supra*. A comprehensive permanent injunction addressed to the conduct that constitutes violations of the act has already issued.[35] We therefore remand

---

[35]The permanent injunction, in pertinent part, enjoins Zotos from "going upon or depositing anything upon [Haufler's land] with only the exception for limited easement uses of Easement D." Aside from the limited easement right

the case to the Superior Court for a determination of the appropriate amount of compensatory damages.

*So ordered.*

---

to parallel park personal vehicles incidental to residential use of Lot D-1, they "are enjoined from placing, installing, depositing, or leaving any signs, electronic equipment or other objects on Easement D or on the trees on Easement D." They are also enjoined from "harassing, following, or in any way interfering with any person who is on [Haufler's land]," "any person who is using Easement D with the verbal or written permission of [Haufler or his family members]," and "any registered land surveyor or person employed by or assisting a registered land surveyor on or within twenty feet of [Haufler's] property, even if such surveyor, employee or assistant is on or believed to be on the defendants' property." Finally, Thomas and Nancy Zotos are enjoined from "touching, altering, or interfering with any boundary marker or surveyor's marker or any object that appears to be . . . such a marker on or within twenty feet of [Haufler's] property, even if it is on or believed to be on the defendants' property."