Fabricant, Judith, J.
*164 INTRODUCTION
This action arises from a set of commercial transactions involving an effort by the plaintiff Pale Horse Designs, Inc., to purchase clothing manufactured by the defendant Stanfab Apparels in India. Defendant Natarajan Rathnam advanced money for payment for the goods, taking in return a note from Pale Horse, guaranteed by the individual plaintiff, Karen Chansky, the principal of Pale Horse. Pale Horse did not pay the loan, and Rathnam threatened collection. The plaintiffs brought this action, naming Rathnam along with Stanfab and an associated entity, Twelve Inch LP, Inc. Presently before the Court is Rathnam’s motion to dismiss for lack of personal jurisdiction. For the reasons that will be explained, the motion will be allowed.
BACKGROUND
Before the Court in connection with this motion are the plaintiffs’ First Amended Complaint (hereinafter “the complaint”),[1] an affidavit of defendant Rathnam, with attached exhibits, and an affidavit of plaintiff Chansky, with attached exhibits. These materials provide the following information. Karen Chansky, a resident of Hamilton, Massachusetts, is the president and founder of Pale Horse Designs, Inc., a Massachusetts corporation with its principal place of business in Danvers. Pale Horse is in the business of designing, procuring manufacture of, and selling at wholesale a line of equestrian apparel, primarily shirts and belts. Defendant Stanfab Apparel, according to the first amended complaint, is “a government recognized factory organized under the laws of India,” with its principal place of business in Chennai, India.
Beginning in 2000, Pale Horse placed orders with Stanfab for merchandise to be manufactured by Stanfab in India, and shipped to Pale Horse in Massachusetts, with payment to be made by Pale Horse within 45 days of receipt. During 2004, problems arose between Pale Horse and Stanfab regarding delays in shipments and the fabric used in manufacture of the goods. As a result of those problems, according to the complaint, customers of Pale Horse cancelled orders, resulting in Pale Horse being unable to pay a balance owed to Stanfab. As of the spring of2005 that balance, along with an additional amount Stanfab claimed to be due, which Pale Horse disputed, came to some $50,000. Stanfab refused to produce further merchandise without payment of that amount.[2]
Chansky’s affidavit asserts that, on June 27, 2005, a meeting occurred in Danvers between Chansky and Erode Ramasamy Eswaran, identified in the complaint and in Chansky’s affidavit as “an agent of Stanfab.”[3] At that meeting, according to Chansky’s affidavit, Eswaran proposed to arrange for Pale Horse to borrow $50,000 from Rathnam, to be paid in 12 monthly installments of $5,000, for a total of $60,000, including $10,000 in interest. Chansky asserts in her affidavit that she “understood Eswaran to be acting on Rathnam’s behalf or as his agent in proposing these terms."
On June 28, 2005, while Chansky and Eswaran again met at Pale Horse’s office in Danvers, she received an e-mail from Rathnam’s New York attorney, with an attached form of note, and instructions to execute the note and mail it, along with twelve postdated checks, to the attorney in New York. The note form provided for Chansky to give her personal guarantee, and also provided for Rathnam to receive a security interest in Pale Horse’s “name brand,” receivables, and all inventory at its storage facility in Dan-vers. The form recited Pale Horse’s Danvers address and Chansky’s address in South Hamilton.
Chansky, according to her affidavit, protested the guarantee provision to Eswaran, but he responded that “the note could not be changed, and that Stanfab would not produce the outstanding shipment of shirts unless I signed the promissory note as a personal guarantor.” Chansky again avers that she “understood Eswaran to be acting on Rathnam’s behalf or as his agent in telling me that these terms could not be changed.” She executed the note and mailed it as instructed, along with the post-dated checks, drawn on her Danvers bank. The first check was dated August 15, 2005.
Rathnam, according to his affidavit, is a United States citizen who lived in New York for fifteen years until he moved to India in July 2006. He has never lived in Massachusetts or owned property here, and has visited or passed through only rarely, never in connection with the transaction involved here. He describes himself as a “software engineer and a small investor.” In the latter capacity, according to his affidavit, he “occasionally lend[s] money to small businesses and start-up companies.”
In June of 2005, according to Rathnam’s affidavit, Eswaran contacted Rathnam in New York and said that one of Eswaran’s customers needed a loan to pay for goods it had ordered from Stanfab in India. Rathnam agreed to pay for the goods in exchange for a note to be executed by Pale Horse and guaranteed by Chansky. His lawyer prepared the note, and on July 11, 2005, Rathnam wired $50,000 from his personal account at Citibank in New York to Stanfab’s bank in India, to be credited to Pale Horse’s account with Stanfab.[4]
Stanfab, according to the plaintiffs’ complaint, failed to ship the goods to Pale Horse as promised. Unable to fill its orders, and therefore unable to cover its post-dated checks to Rathnam, Pale Horse stopped payment on the first check, which then bounced when Rathnam attempted to deposit it. On August 22, 2005, Rathnam sent an e-mail to Eswaran, with a copy to Chansky, asking Eswaran to “please ask your client to send a new check for the 5010.00 immediately.”[5] A staff person at Pale Horse responded to Rathnam by e-mail the same day, saying that Pale Horse had sent *165 twelve new checks with a starting date of September 5, 2005, plus a $100 late fee, to the address of Rathnam’s lawyer in New York.
Pale Horse’s financial difficulties, which it attributes to conduct of Stanfab, continued. On September 15, 2005, Rathnam sent an e-mail to Chansky, with a copy to Eswaran, saying that he planned to deposit the check dated September 5, 2005, on September 19th, and asking to be informed whether “there is any issue with that.” The following day, September 16, 2005, Eswaran sent an e-mail to Chansky saying that he was “not happy with the happenings about the repayment of loan to Mr. Natarahan Rathnam of New York. He will be helpful to any extend in our future business including our ‘fell on fashion business. Correct yourself immediately.” Chansky responded to Es-waran the same day, saying that “there is no cash flow. I am sending him a little money every week and I have offered to pay additional financing costs.”
On October 19, 2005, Rathnam sent an e-mail to Chansky, with a copy to Eswaran, saying that to date he had received only $200, that phone calls had not been returned, and that “(a]t this point the note is in serious breach.” He demanded that Chansky call him within one week to arrange a payment schedule; announcing that “[flailing to do that, will result in exercising note default action.” His e-mail said that a copy of it was being mailed to Pale Horse at its Danvers address. Rathnam’s affidavit says that he placed one call to Chansky’s cell phone, which Chansky answered, saying she was in a meeting and would call back, and that she never did. He states “I did not know where Chansky was located at the time of the cell phone call.” Chansky’s affidavit does not refer to any telephone communication between her and Rathnam.
Chansky responded to the October 19,2005, e-mail on the same date, saying that Pale Horse had sent $2,000, and that Pale Horse’s bookkeeper would call him each week “and review what can be sent to you.” Rathnam e-mailed back, saying that he was unwilling to extend the term of the loan, but would be willing to give Pale Horse “a 3 month period to catch up with the payment and be on time to close it out by the anniversary as planned.” In reply, Chansky blamed Stanfab’s delays in shipments for Pale Horse’s difficulties, and said that “when we are in season we will try to make up ground,” and that “I will do my best each week to get you what I can.”
Rathnam e-mailed Chansky again on November 28, 2005, saying that “the amount you have paid so far didn’t even cover the interest for the loan. At this point, I am going to cntact my attorney to take action on the promisery note unless you pay at least $10,000 before Dec 10, 2005.” He sent one more e-mail, on January 31, 2006, saying that he had not heard from her in over a month and had received nothing since December 15, 2005, that he had received only a total of $2,000, and that “You have to get your act together and start making the payments. I do know that my collateral (brand name) is more valuable than the loan amount.” The next communication was a certified letter, dated March 6, 2006, from Rathnam’s New York attorney to Pale Horse’s Danvers office, threatening “an immediate collection proceeding” ábsent prompt payment “or an acceptable proposal for payment.” Thereafter, according to Rathnam’s affidavit, he retained a lawyer and “initiated legal proceedings in India, where Chansky has an apartment, to pursue the debt against Pale Horse and Chansky.”
The plaintiffs’ complaint alleges that agents of Stanfab harassed Chansky at her Chennai, India, apartment during a visit there in June 2006; that she complained to the Chennai police; and that an agent of Stanfab responded by showing the police “a copy of an old invoice from Stanfab to Pale Horse,” saying that the invoice was unpaid. On that basis, the complaint alleges, “Pale Horse asserts that Rathnam had never forwarded the sum of $50,000 to Stanfab as required under the Promissory Note.” The complaint goes on to allege that in September 2006, “an attorney in Chennai purporting to represent Rathnam wrote a series of letters to the plaintiffs threatening to press criminal charges in India for passing bad checks.”
The complaint sets forth nine counts, three against Rathnam. Count I alleges breach of contract by Rathnam in the alleged failure to make payment to Stanfab. Count v. seeks a declaratory judgment that that alleged failure provides “full and complete defenses to any claim” against Pale Horse and Chansky based on the note, and further that the note was “part of a three-party agreement” with Pale Horse and Stanfab, so that Stanfab’s failure to deliver goods as agreed provides Pale Horse and Chansky “full and complete defenses to any claim against either of them based on the Promissory Note.” Count VII alleges breach by Rathnam of the implied covenant of good faith and fair dealing, in that Rathnam’s alleged breach of “Rathnam’s and Plaintiffs’ agreement to enter into the Promissory Note ... prevented Plaintiffs from benefitting from the fruits of that contract,” and further that “Rathnam’s subsequent harassment of the Plaintiff was done with intent to harm plaintiffs and was conducted in bad faith.”
DISCUSSION
A plaintiff facing a motion to dismiss under Mass.R.Civ.P. 12(b)(2) bears the burden of establishing facts sufficient to show that the Massachusetts Court has personal jurisdiction over the defendant. See Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 151 (1978). In assessing the record on such a motion, the Court construes the facts in the light most favorable to the plaintiff, just as on a motion for summary judgment. See Tatro v. Manor Care, Inc., 416 Mass. 763, 765 (1994), citing Alioto v. Marnell, 402 Mass. 36, 37 (1988). When considering the plaintiffs evidence, however, the Court need not “credit conclus- *166 oiy allegations or draw farfetched inferences.” Workgroup Technology Corp. v. MGM Grand Hotel, LLC, 246 F.Sup.2d 102, 108 (D.Mass., 2003).[6]
Personal jurisdiction over a non-resident defendant depends on a two-pronged test. First, the defendant’s conduct must fall within the limits of the Massachusetts long-arm statute, G.L.c. 223A, §3(a)-(h). Second, if jurisdiction is authorized by statute, its exercise must also comply with the basic due process requirements mandated by the United States Constitution. See Tatro v. Manor Care, Inc., 416 Mass. at 767. Often this two-part test converges into a single inquiry, since G.L.c. 223A “functions as ‘an assertion of jurisdiction’ over the person to the limits allowed by the Constitution of the United States.” Good Hope Indus., Inc., v. Ryder Scott Co., 378 Mass. 1, 6 (1979), quoting Automatic Sprinkler Corp. of America v. Seneca Foods Corp., 361 Mass. 441, 443 (1972). If a case does not meet the requirements of the statute, the Court has no occasion to examine whether jurisdiction would comport with due process. See Morrill v. Tong, 390 Mass. 120, 133 (1983).
Here, the plaintiffs rely on c. 223A, §3(a), which authorizes the Court to “exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person’s (a) transacting any business in this commonwealth.” For jurisdiction to exist under this provision, “the facts must satisfy two requirements — the defendant must have transacted business in Massachusetts, and the plaintiffs claim must have arisen from the transaction of business by the defendant.” Roberts v. Legendary Marine Sales, 447 Mass. 860, 863 (2006), quoting Tatro v. Manor Care, Inc., 416 Mass. at 767. “The transacting business clause . . . has been construed broadly . . . Although an isolated (and minor) transaction with a Massachusetts resident may be insufficient, generally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement.” Tatro, supra, 416 Mass. at 767.
In determining whether a defendant’s contacts with Massachusetts rise to the level of transacting business, or, on the contrary, are too isolated to confer jurisdiction, courts evaluate “the relations between the parties, their respective activities under the contract, and the linkages, if any, between the defendant’s participation in the transaction and the Commonwealth of Massachusetts.” Telco Communications v. New Jersey State Firemen’s Mutual Benevolent Association, 41 Mass.App.Ct. 225, 229 (1996). The location of the defendant’s performance as contemplated under the contract is of particular importance. See Good Hope Industries, Inc. v. Ryder Scott Co., 378 Mass. at 9; Telco, supra at 229-30; see also Lyle Richards International Ltd. v. Ashworth, Inc., 132 F.3d 111, 113 (1st Cir. 1997). Also significant is whether the transaction has “a material impact on the commerce of Massachusetts.” Good Hope, supra, at 8, citing Automatic Sprinkler Corp. of America v. Seneca Foods Corp., 361 Mass. 441, 446 (1972); Tatro, supra at 231, citing Connecticut National Bank v. Hoover Treated Wood Prod., Inc., 37 Mass.App.Ct. 231, 234 (1994); see also Intech, Inc., v. Triple “C” Marine Salvage, Inc., 444 Mass. 122, 126 (2005), citing Droukas v. Divers Training Academy, Inc., 375 Mass. at 154 (1978); Lyle Richards International Ltd. v. Ashworth, Inc., supra
Always underlying the analysis are the constitutionally based questions of whether a defendant has, by some “affirmative, intentional act,” “purposefully avail[ed] itself of the privilege of conducting activities within the forum State thus invoking the benefits and protections of its laws,” “such that it is fair and reasonable to require the defendant to come into the State to defend the action.” Good Hope Industries, Inc., v. Ryder Scott Co., 378 Mass. at 7, quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958). A defendant’s contacts with Massachusetts must have been “deliberate and not fortuitous, such that ‘the possible need to invoke the benefits and protections of the forum’s laws was reasonably foreseeable, if not foreseen, rather than a surprise.’ ” Good Hope, supra, at 10, quoting Product Promotions, Inc. v. Cousteau 495 F.2d 483, 496 (5th Cir. 1974).
Here, the plaintiffs’ theory is that Rathnam, acting through Eswaran as his agent, solicited the plaintiffs’ business in Massachusetts as aborrower of funds. The record certainly establishes that Eswaran solicited the plaintiffs’ business, and that he did so in Massachusetts. He met with Chansky here, at least twice, and encouraged her to borrow funds from Rathnam, on behalf of Pale Horse, to be paid to Stanfab for goods to be manufactured and delivered on Pale Horse’s order. Eswaran’s conduct, however, cannot be attributed to Rathnam unless the plaintiffs can establish that Es-waran acted as Rathnam’s agent. Chanksy’s subjective belief, as asserted in her affidavit, does not so establish.
To show agency the plaintiffs would have to show that Rathnam authorized Eswaran to act on his behalf, or that Rathnam (not Eswaran) conducted himself in such a way that a reasonable person in the plaintiffs’ position would have believed that he had authorized Eswaran to act for him. See Motorsport Engineering, Inc. v. Maserati SpA, 316 F.3d 26, 29-30 (1st Cir. 2002); Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 16 (1997); Haufler v. Zotos, 446 Mass. 489, 498 (2006); see also Restatement (Second) of Agency §1 cmt. a (1958). Nothing in the record indicates that Rathnam ever authorized Eswaran to act for him, or ever did anything to create the impression that he had. To the contrary, the facts presented indicate that Eswaran acted as an independent broker, bringing borrower and lender together because it served his interests, as well as theirs, to do so.[7]
Jurisdiction must therefore depend on Rathnam’s own actions, not Eswaran’s. What the record reveals *167 is that, having been solicited by Eswaran, in New York, to lend to Pale Horse, Rathnam caused his New York lawyer to prepare and send a note to the borrower in Massachusetts, which the lawyer did by e-mail. After receiving the note back, along with checks drawn on a Massachusetts bank, sent by the plaintiffs from Massachusetts to New York, Rathnam wired funds from New York to India, thereby performing his only obligation under the agreement. He then attempted unsuccessfully to deposit the plaintiffs’ first check into his account in New York. Thereafter, in efforts to collect on the note, he sent six e-mails to Chansky in Massachusetts, made one call to her cell phone, and caused his New York lawyer to send one letter to the plaintiffs in Massachusetts.
The only part of this sequence of events that might possibly be characterized as solicitation of business by Rathnam is his lawyer’s transmission of the note and instructions. The text of the lawyer’s e-mail does not support that characterization. The lawyer did not propose or invite business, but merely transmitted a form by which to effectuate a transaction that, it appears from the document, had already been fully arranged. It was only after the plaintiffs stopped payment on the first check that Rathnam undertook a series of communications to the plaintiffs in Massachusetts.
The arrangements made between the parties called for a single act of performance by Rathnam, the sending of money to India, which he did from New York. On the other side, the arrangements for the plaintiffs’ performance, by sending twelve post-dated checks up front, were such as to minimize contacts between the parties. Having sent the checks, all the plaintiffs were required to do was to keep sufficient funds in the account to cover them, and refrain from stopping payment. Had the plaintiffs done so, the parties would have had no occasion for any further communication. It is apparent that the parties contemplated an isolated transaction, to occur at one time, not the initiation of any on-going relationship. The single transaction contemplated could be expected to have minimal impact on commerce in Massachusetts.
Of course, a reasonable person in Rathnam’s position would have foreseen the possibility of default, and would have considered the enforcement mechanisms that would have been available or necessary. Rathnam clearly did so, since he included in the note provisions for Chansky’s personal guarantee and for a security interest in Pale Horse’s assets. The possibility that he might choose to seek assistance from Massachusetts courts to collect on the note, or to enforce his security interest, was certainly foreseeable, but any such action would have been voluntary on his part. That he, as the lender, might be compelled to defend in Massachusetts is an entirely different matter, which he could not be expected to foresee as a result of this transaction.
The facts presented here are similar to those in Roberts v. Legendary Marine Sales, 447 Mass. 860, 861 (2006), where the Supreme Judicial Court affirmed dismissal for lack of jurisdiction over a seller of a boat. There the Massachusetts buyer and the out-of-state seller came together through an advertisement the seller had placed on a web site. After a series of communications by e-mail and telephone, they exchanged documents and payment by mail, and the buyer then utilized an independent contractor to pick up the boat and transport it to Massachusetts. These contacts, the Court held, were insufficient to establish jurisdiction over the seller on the buyer’s suit for defects in the boat, because the transaction “was an isolated one lacking a justifiable ground on which to assert jurisdiction.” Id. at 863, quoting Intech, Inc., supra, 444 Mass. at 126.
Intech, supra, also presents facts similar to these, on which the Court held jurisdiction lacking. There the out-of-state seller of equipment placed an advertisement in a national magazine, to which the Massachusetts buyer responded. Through an agent, the buyer contacted the seller by telephone and made an agreement, which was then reflected in an invoice faxed by the seller to Massachusetts. After receiving payment, the seller sent a bill of sale to Massachusetts. Thereafter, the seller telephoned the buyer’s agent in Massachusetts to offer a second piece of equipment, leading to a similarly small number of further telephone communications, culminating in transmission of a similarly small number of documents. The Court held these contacts between the seller and Massachusetts insufficient as “two isolated transactions having ‘slight effect on the commerce of the Commonwealth and... void of any purposeful intent on the part of the defendant to avail itself of the privilege of conducting activities within the forum state.’ ” Id, at 127, quoting Droukas v. Divers Training Academy, Inc., 375 Mass. at 154.
The facts of Telco Communications, supra, 41 Mass.App.Ct. at 225, are also instructive. There a Massachusetts company initiated negotiations with a New Jersey organization for a contract under which the Massachusetts company would sell advertising for the New Jersey entity’s publication. In the course of negotiation, a series of drafts were faxed between Massachusetts and New Jersey. Although the primary performance — that is, the selling of advertising — was to occur in New Jersey, the contract provided for printing of the publication in Massachusetts, subject to approval of the final product by the New Jersey entity. Telephone calls and exchanges of advertising information and copy occurred between the parties in the two states. These contacts, the Court held, were insufficient, because “the center of gravity” and indeed the “great heft” of the transaction was in New Jersey, and the transaction did not have a material impact on the commerce of Massachusetts. Id. at 230-31.
*168 These cases indicate that determining jurisdiction is not a matter of counting communications between states, whether by electronic or other means, but of evaluating the overall substance and effect of the transaction. In each case, jurisdiction was absent where an out-of-state defendant sent a number of communications into Massachusetts in connection with an isolated transaction, but lacked any ongoing relationship with the Commonwealth or the resident party, and did not solicit business here. In this case, similarly, Rathnam’s handful of communications into Massachusetts does not confer jurisdiction, where the transaction in issue was narrow in scope and time and not part of any broader relationship, and where his performance occurred outside Massachusetts.
The plaintiffs cite Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. at 6. There the out-of-state defendant held itself out as providing appraisal services to companies throughout the United States and the world. Under its contract with the Massachusetts plaintiff, it sent at least nine appraisal reports to Massachusetts over the course of a year, which its personnel discussed with personnel of the plaintiff regularly in telephone calls, at least fífiy-two of which it initiated. It also sent at least seventeen invoices over a period of more than ayear. The appraisal reports it provided were expected to be, and were, relied upon by the Massachusetts plaintiff and others in Massachusetts with whom it did business. These facts, the Court held, amounted to “an enterprise of substantial dimension and duration,” involving “close contact” between the parties over time," sufficient to constitute transacting business. Id. at 10-11. The facts of this case contrast sharply with those of Good Hope. The plaintiffs point to the one-year duration of the note in this case, and compare it to the one-year period in Good Hope, but the similarity is superficial at best. The arrangement these parties agreed to was that the plaintiffs would send twelve post-dated checks all at once, at the outset. If the agreement had been followed, the relationship would have ended there, with no on-going interaction other than the defendant’s depositing the checks each month.
The plaintiffs also cite Nova Biomedical Corp. v. Moller, 629 F.2d 190, 195 (1st Cir. 1980). The defendant in that case, a holder of patents, had an on-going licensing agreement with a Massachusetts company other than the plaintiff, under which it had received regular royalty payments for a period of years, and had obligations and rights to regular exchanges of reports and inspection of books. The defendant also made regular sales of products to that company, corresponded with it extensively, and had visited Massachusetts twice for business purposes. The dispute in issue arose not from that relationship, but from the defendant’s sending of two cease-and-desist letters to the plaintiff, claiming infringement of one of the patents licensed to that other Massachusetts company. The cease-and-desist letters, the Court observed, constituted “an attempt to reduce competition and thereby improve defendant’s marketing and economic position,” id. at 195, quoting B&J Manuf. Co. v. Solar Indus., Inc., 483 F.2d 594, 598 (8th Cir. 1973), cert. denied, 415 U.S. 918 (1974), and on that basis could fairly be viewed as “an extension or component of the defendant’s patent-related business activities in the forum.” Nova Biomedical Corp., 629 F.2d at 195. On these particular facts, the Court held that sending the cease-and-desist letters constituted transacting business. Id. at 197.
The other cases the plaintiffs cite are similarly distinguishable. In Workgroup Technology Corp. v. MGM Grand Hotel, LLC, 246 F.Sup.2d at 109-10, the out-of-state defendant engaged in extensive communications with its Massachusetts customer over a three-month period before entering into the contract giving rise to the dispute. It also advertised in Massachusetts for convention business at its Nevada facility. In Energy Capital and Services v. Hill Refrigeration, 989 F.Sup. 353, 355 (D.Mass. 1997), the parties entered into an agreement for services to be performed over a ten-year period; during the first four years, the parties were in regular contact regarding performance and administration of the agreement, and the out-of-state defendant regularly directed inquiries to the plaintiff in Massachusetts; and the parties held funds in an escrow account in Massachusetts. The facts of this case are not similar to those in these cases. The isolated transaction here was not sufficient to constitute transacting business in Massachusetts for purposes of jurisdiction under c. 223, §3(a).
CONCLUSION AND ORDER
For the reasons stated, Defendant Rathnam’s Motion to Dismiss for Lack of Personal Jurisdiction is ALLOWED.

The First Amended Complaint is not verified, although the original complaint was.

The complaint sets forth a series of events involving alleged defaults by Stanfab on an agreement regarding a joint venture; the details do not bear on the issue of jurisdiction over Rathnam.

Rathnam’s affidavit describes Eswaran as the owner of Stanfab, and a friend of Rathnam since 2004.

Although Rathnam asserts that he did not know that Pale Horse was a Massachusetts corporation or that it did business in Massachusetts, as indicated supra, the note form, drawn by his lawyer, reflects Pale Horse’s and Chansky’s Massachusetts addresses. Rathnam’s lawyer’s knowledge is attributable to Rathnam.

The figure includes a $10 bank charge for the bounced check.

The Court places in this category the allegation of the complaint that “Pale Horse asserts that Rathnam had never forwarded the sum of $50,000 to Stanfab as required under the Promissory Note,” which lacks support in any affidavit, and which is directly contradicted by Rathnam’s affidavit.

At argument on the present motion, plaintiffs’ counsel suggested that Eswaran was acting as an agent for both the plaintiffs and Rathnam. That characterization is inconsistent with agency, but is consistent with the role of an independent broker.