SALVATORE LICATA, JR., administrator,[1] vs. GGNSC MALDEN
DEXTER LLC.

Suffolk. September 4, 2013. - January 13, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

Arbitration. Health Care Proxy. Nursing Home. Agency, Scope of authority or
employment, What constitutes, Ratification. Consent. Incompetent Person,
Consent to medical treatment. Contract, Arbitration, Parties, Validity,
Third party beneficiary. Estoppel.

In a wrongful death action brought in Superior Court by the plaintiff, the
administrator of the estate of his deceased mother, against the defendant
nursing home operator, the judge did not err in denying the defendant's
motion to compel arbitration based on an arbitration agreement that the
plaintiff had signed on the decedent's behalf during the nursing home's
admissions process, where the decedent's designation of the plaintiff as her
health care agent did not include the authority to execute the arbitration
agreement [796-797]; where, at any rate, the decedent's health care proxy
was activated not by an attending physician's transfer report to the nursing
home, which did not satisfy statutory requirements concerning the determina-
tion of incapacity, but by a determination of resident incapacity made three
weeks after the plaintiff signed the agreement [797-799]; and where the
agreement did not otherwise bind the decedent's estate under theories of
incompetency, apparent authority, ratification, third-party beneficiary, or
equitable estoppel [799-804].

CIVIL ACTION commenced in the Superior Court Department on
August 1, 2011.

A motion to dismiss the complaint and to compel arbitration
was heard by Paul E. Troy, J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

Joseph M. Desmond (Thomas T. Worboys with him) for the
defendant.

Michael R. Rezendes (Patricia J. Rezendes with him) for the
plaintiff.

[1] Of the estate of Rita Licata.

*Kelly Bagby,* of the District of Columbia, & *Rebecca J. Benson* & *Debra Silberstein,* for National Academy of Elder Law Attorneys (Massachusetts Chapter) & another, amici curiae, submitted a brief.

Duffly, J. The plaintiff, Salvatore Licata, Jr., commenced this wrongful death action in the Superior Court as the administrator of the estate of his deceased mother, Rita Licata.[2] The defendant nursing home operator moved to compel arbitration based on an arbitration agreement that Salvatore signed purportedly on his mother's behalf. Because we conclude that Salvatore lacked authority to execute an arbitration agreement on Rita's behalf, and the arbitration agreement does not otherwise bind Rita's estate, we affirm the Superior Court judge's denial of the defendant's motion.[3]

*Background.* On August 19, 2008, the day after Rita was admitted to a medical center for evaluation of increased confusion, she signed a health care proxy designating Salvatore as her health care agent, pursuant to G. L. c. 201D, § 5, in the event of her incapacity to make health care decisions.

Three days later, on August 22, 2008, Rita was discharged from the medical center and transferred to a nursing facility operated by the defendant GGNSC Malden Dexter LLC (GGNSC). Rita's attending physician at the medical center authored a transfer report containing a three-page summary of Rita's condition upon entering and exiting the medical center and the treatment Rita received while a patient there. Upon her arrival at the nursing facility, Rita was taken to her room. The nursing facility's admissions director meanwhile brought Salvatore to a separate office, where Salvatore completed Rita's admissions documents. At some point during the admissions process, the admissions director went to Rita's room and informed her that Salvatore was signing papers for her and would discuss them with her later. However, "Rita did not appear to understand and did not respond." Nothing in the record suggests that Salvatore or anyone else ever discussed any of the documents with Rita.

---

[2]Because they share a last name, we refer to Salvatore Licata and Rita Licata by their first names.

[3]We acknowledge the amicus brief of the National Academy of Elder Law Attorneys, Inc. (Massachusetts Chapter), and the American Association of Retired Persons in support of the plaintiff.

Among the admissions documents, Salvatore signed an admission agreement in the space provided for "Resident's Legal Representative," and other documents in the spaces provided for Rita's "Representative" or "Responsible Party." Salvatore also signed a separate document entitled "Resident and Facility Arbitration Agreement" (arbitration agreement), which provides, in relevant part:

> "It is understood and agreed by Facility and Resident that any and all claims, disputes, and controversies . . . arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration . . . ."

The arbitration agreement explained that "execution of this Arbitration Agreement is not a precondition to admission or to the furnishing of services to the Resident by the Facility. . . ." Salvatore signed the agreement in the space provided for the resident's "Authorized representative." According to the terms of the agreement, by signing in this fashion, Salvatore certified that he was "duly authorized" to execute the agreement on Rita's behalf. Rita did not sign the arbitration agreement and, as the motion judge found, "never did or said anything which would constitute ratification of [Salvatore's] act of signing [it]."

On September 10, 2008, almost three weeks after her admission to the nursing facility, Rita's attending physician completed a one-page document entitled "Documentation of Resident Incapacity Pursuant to Massachusetts Health Care Proxy Act [G. L. c.] 201D," reflecting his determination that Rita lacked the capacity to make health care decisions. The document provides that this determination was made "in accordance with accepted standards of medical judgment." It also describes the cause of Rita's incapacity as "[d]ementia," its nature as "Alzheimer's," its extent as "moderate," and its probable duration as "indefinite."

Rita suffered personal injuries while a resident at GGNSC's nursing facility, resulting in her death on August 10, 2009. As administrator of Rita's estate, Salvatore filed a complaint in the Superior Court alleging that GGNSC caused Rita's injuries and

wrongful death, and raising a number of additional claims for relief, among them negligence, breach of contract, and unfair or deceptive acts or practices under G. L. c. 93A. Relying on the arbitration agreement signed by Salvatore, GGNSC filed a motion to dismiss the complaint and to compel arbitration pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16 (2012), and the Massachusetts Arbitration Act (MAA), G. L. c. 251 §§ 1-19. Because arbitration is a matter of contract, neither the FAA nor the MAA compels arbitration of claims brought by one who is not covered by an arbitration agreement. See *Equal Employment Opportunity Comm'n* v. *Waffle House, Inc.*, 534 U.S. 279, 289 (2002); *Ladd* v. *Scudder Kemper Invs., Inc.*, 433 Mass. 240, 246 (2001). Accordingly, a judge of the Superior Court ordered that an evidentiary hearing take place to resolve factual questions relating to the issue of Salvatore's authority to sign the arbitration agreement on Rita's behalf.

Following the hearing, the motion judge concluded that although the arbitration agreement was not unconscionable, Salvatore lacked authority to execute the arbitration agreement on Rita's behalf. The judge therefore denied GGNSC's motion to dismiss and to compel arbitration. GGNSC took an interlocutory appeal as a matter of right pursuant to 9 U.S.C. § 16 and G. L. c. 251, § 18 (*a*). We transferred the case to this court on our own motion.

*Discussion.* GGNSC presents a number of arguments for enforcing the arbitration agreement, notwithstanding Rita's failure to sign it. We address each of these arguments in turn. In so doing, we review questions of law de novo and defer to the motion judge's findings of fact unless clearly erroneous. See *Sheriff of Suffolk County* v. *Jail Officers & Employees of Suffolk County*, 465 Mass. 584, 588 (2013), and cases cited.

1. *Authority under the health care proxy.* GGNSC argues that Salvatore was authorized to sign the arbitration agreement as Rita's health care agent. Pursuant to the health care proxy statute, G. L. c. 201D, "[e]very competent adult shall have the right to appoint a health care agent by executing a health care proxy." G. L. c. 201D, § 2. The proxy authorizes a health care agent to make "health care decisions" on the principal's behalf should the principal become incompetent. G. L. c. 201D, §§ 5, 6. The

proxy must, among other things, state both the health care agent's authority to make health care decisions and that "the agent's authority shall become effective if it is determined pursuant to section six that the principal lacks capacity to make health care decisions." G. L. c. 201D, § 4. In accordance with these require-ments, Rita's health care proxy states:

> "My Agent shall have the authority to make all health care decisions for me, including decisions about life-sustaining treatment . . . if I am unable to make health care decisions myself. My Agent's authority becomes ef-fective if my attending physician determines in writing that I lack the capacity to make or to communicate health care decisions."

Although Rita's attending physician had not yet executed the "Documentation of Resident Incapacity Pursuant to Mas-sachusetts Health Care Proxy Act [G. L. c.] 201D" at the time Salvatore signed the arbitration agreement, GGNSC maintains that the transfer report, prepared while Rita was still a patient at the medical center, activated the health care proxy because it included a diagnosis by her attending physician that Rita suf-fered from "dementia of the Alzheimer type" and noted that her "[i]nsight and judgment were chronically impaired." GGNSC then contends that signing an arbitration agreement constitutes a health care decision within the authority of a health care agent.

Our decision in *Johnson* v. *Kindred Healthcare, Inc., ante* 779, 781 (2014), disposes of GGNSC's claim by holding that "a health care agent's decision to enter into an arbitration agree-ment is not a health care decision as that term is defined and used in the health care proxy statute." Nonetheless, because the question has been raised and the parties have fully briefed the issue whether a transfer report or similar medical record can activate a health care proxy, we address that question. See *Royal-Globe Ins. Co.* v. *Craven*, 411 Mass. 629, 636 (1992).

General Laws c. 201D, § 6, sets forth detailed requirements concerning the determination of incapacity for purposes of activating a health care proxy. The patient's attending physician must determine, and set forth in writing, that "the principal lacks the capacity to make or to communicate health care

decisions." G. L. c. 201D, § 6. As defined by G. L. c. 201D, § 1, lack of capacity means that the patient lacks "the ability to understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of and alternatives to any proposed health care, and to reach an informed decision." The attending physician must make this determination "according to accepted standards of medical judgment," and if the patient's incapacity derives from mental illness or developmental disabilities, the physician either must have, or consult with someone who has, "specialized training or experience in diagnosing or treating mental illness or developmental disabilities of the same or similar nature." G. L. c. 201D, § 6. The written determination must also "contain the attending physician's opinion regarding the cause and nature of the principal's incapacity as well as its extent and probable duration." G. L. c. 201D, § 6.

Moreover, the physician must give prompt oral and written notice of the determination "to the principal, where there is any indication of the principal's ability to comprehend such notice[, and] to the agent." G. L. c. 201D, § 6. This notice must be unambiguous, given that it activates the health care agent's power to make binding medical decisions on the principal's behalf, thereby implicating the principal's "strong interest in being free from nonconsensual invasion of his bodily integrity." *Johnson* v. *Kindred Healthcare, Inc., supra* at 782, quoting *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 739 (1977). Cf. *Guardianship of Roe*, 383 Mass. 415, 442 (1981) ("in the absence of an independent finding of incompetency to make treatment decisions, we cannot assume that a mentally ill ward lacks the capacity to [refuse antipsychotic drugs]").

The transfer report does not satisfy these statutory requirements. Indeed, although it includes a diagnosis of dementia and states that Rita suffers from chronically impaired insight and judgment, the report also suggests some capacity on Rita's part: it notes that Rita "improved over the course of the hospital stay" and that "[w]hen the interview was structured, she seemed to be more coherent with her thought processes." The transfer report makes no reference to Rita's capacity or incapacity to

make or communicate health care decisions. Cf. *Cohen* v. *Bolduc*, 435 Mass. 608, 618 n.25 (2002), quoting *Matter of Moe*, 385 Mass. 555, 567-568 (1982) ("A person may be adjudicated legally incompetent to make some decisions but competent to make others"). Nor does the record reflect that the author of the transfer report, Rita's attending physician at the medical center, notified Rita and Salvatore of the physician's medical determination that Rita lacked the capacity specifically to make health care decisions.

Furthermore, treating a transfer report or similar medical record both as a determination of incapacity to make health care decisions and as notice to a principal and agent that a health care proxy is effectuated would create uncertainty about when the proxy has been triggered and deprive a principal of the opportunity to object to its activation. See R.B. Minehan & R.M. Kantrowitz, Mental Health Law § 10.17, at 131 n.3 (Supp. 2012) (noting that health care providers face potential liability "for providing treatment after failing to give notice [of activation] to the principal if there were indeed any indication that the principal would comprehend such notice because they would have removed the principal's opportunity to object to the activation"). Thus, Rita's health care proxy did not take effect until her attending physician at the nursing facility executed the "Documentation of Resident Incapacity Pursuant to Massachusetts Health Care Proxy Act [G. L. c.] 201D," almost three weeks after her admission to the facility.[4]

2. *Authority as a "responsible party."* GGNSC argues in the alternative that Salvatore was authorized to sign the arbitration agreement as Rita's son and "responsible party" under G. L. c. 201D, § 16. This argument is unavailing.

General Laws c. 201D, § 16, provides that

"[i]n those instances that a health care proxy has not been executed, nothing herein shall preclude a health care provider from relying upon the informed consent of

---

[4]In contrast to the transfer report, this document meets all the requirements of G. L. c. 201D, § 6. It succinctly describes the nature, cause, extent, and probable duration of Rita's incapacity to make health care decisions. The document's purpose is clear: it states that it intends to activate the patient's health care proxy.

> responsible parties on behalf of incompetent or incapaci-
> tated patients to the extent permitted by law."

This provision acts as a savings clause, preserving power to certain individuals to give informed consent on behalf of incompetent patients, even in the absence of a health care proxy, "to the extent permitted by law." General Laws c. 201D, § 16, does not grant authority where none otherwise exists.

Our decisional law recognizes the power of certain responsible parties to act on behalf of a patient in a medical emergency, where the patient has not executed a health care proxy but lacks capacity to make decisions regarding medical treatment. See, e.g., *Shine* v. *Vega*, 429 Mass. 456, 466 (1999) ("If the patient's consent cannot be obtained because the patient is unconscious or otherwise incapable of consenting, the emergency physician should seek the consent of a family member if time and circumstances permit"); *Guardianship of Roe*, 383 Mass. at 441, quoting *Rogers* v. *Okin*, 634 F.2d 650, 660 (1st Cir. 1980), vacated and remanded sub nom. *Mills* v. *Rogers*, 457 U.S. 291 (1982) ("the interests of the patient himself would [not] be furthered by requiring responsible [parties] to stand by and watch him slip into possibly chronic illness while awaiting an adjudication" [alterations in original]). See also P.M. Annino, Estate Planning § 4.1, at 102 n.2 (3d ed. 2007) ("In most cases, if a proxy has not been signed and if all involved parties agree as to the medical and health care decisions there will be no need to go to court").

However, GGNSC cites no binding authority for the position that a responsible party authorized to give informed consent on behalf of an incompetent patient also may bind the patient to an arbitration agreement. In light of our decision in *Johnson* v. *Kindred Healthcare, Inc.*, *supra* at 788, that a health care agent's authority to make health care decisions does not include the power to sign an arbitration agreement on the principal's behalf, we do not adopt such a position. It would be unreasonable to recognize a wider scope of authority for a responsible party, not appointed by the principal, than exists for a health care agent, designated by the principal.[5] Thus, even assuming that Salvatore

---

[5]Indeed, even in other jurisdictions where courts have determined that a

qualified as a responsible party for purposes of giving informed consent to medical treatment, this role did not empower him to sign an arbitration agreement on Rita's behalf.

3. *Apparent authority.* GGNSC fares no better in its contention that Salvatore had apparent authority to sign the arbitration agreement on Rita's behalf. Apparent authority arises from "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Haufler* v. *Zotos*, 446 Mass. 489, 497 n.22 (2006), quoting *Neilson* v. *Malcolm Kenneth Co.*, 303 Mass. 437, 441 (1939). The party asserting the existence of apparent authority bears the burden of proof. See *Theos & Sons, Inc.* v. *Mack Trucks, Inc.*, 431 Mass. 736, 745 (2000).

As evidence of Salvatore's apparent authority, GGNSC points to his act of signing the arbitration agreement in the space provided for Rita's "Authorized representative," which, according to the language on the form, certified that he was "duly authorized" to execute the arbitration agreement on Rita's behalf. GGNSC also cites Salvatore's signature on other admissions documents in the spaces provided for Rita's "Representative" or "Responsible Party."

Only the words and conduct of the principal, however, and not those of the agent, are considered in determining the existence of apparent authority. See *Kansallis Fin. Ltd.* v. *Fern*, 421 Mass. 659, 665 n.5 (1996); *Normandin* v. *Eastland Partners, Inc.*, 68 Mass. App. Ct. 377, 385 (2007). As courts in other jurisdictions have recognized, a purported agent's own representations, absent authority from the principal to make such representations, cannot establish apparent authority to sign an arbitration agreement on a nursing home resident's behalf. See, e.g., *Ping* v. *Beverly Enters., Inc.*, 376 S.W.3d 581, 594 (Ky. 2012), cert. denied, 133 S. Ct. 1996 (2013); *Dickerson* v. *Lon-*

---

health care power of attorney may provide authority to enter into arbitration agreements, those courts also have decided that a surrogate or next of kin authorized by statute to make health care or medical treatment decisions cannot bind a patient to an arbitration agreement with a nursing facility. See, e.g., *Hogan* v. *Country Villa Health Servs.*, 148 Cal. App. 4th 259, 268 (2007), citing *Pagarigan* v. *Libby Care Ctr., Inc.*, 99 Cal. App. 4th 298, 302 (2002); *Lujan* v. *Life Care Ctrs. of Am.*, 222 P.3d 970, 972-973, 977 (Colo. Ct. App. 2009).

*goria,* 414 Md. 419, 435 (2010); *Texas Cityview Care Ctr., L.P. v. Fryer,* 227 S.W.3d 345, 354 (Tex. App. 2007).

GGNSC points to no conduct by Rita to support its claim that Salvatore had apparent authority to sign the arbitration agreement. She was not in the same room as Salvatore when he signed the admissions documents. Moreover, the record reflects that when GGNSC's admissions director told Rita that Salvatore was signing documents for her, "Rita did not appear to understand and did not respond."[6] Thus, GGNSC has not established Salvatore's apparent authority to sign the arbitration agreement.

4. *Ratification.* GGNSC contends further that, even if Salvatore lacked authority to sign the arbitration agreement at the time, Rita subsequently ratified his act. "Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts." *Linkage Corp.* v. *Trustees of Boston Univ.,* 425 Mass. 1, 18, cert. denied, 522 U.S. 1015 (1997). *Irving Tanning Co.* v. *Shir,* 295 Mass. 380, 384 (1936). "Ratification must be based upon full knowledge of all material facts, subject, however, to the qualification that there may be ratification 'when one purposely shuts his eyes to means of information within his own possession and control, and ratifies an act deliberately.' " *Kidder* v. *Greenman,* 283 Mass. 601, 615 (1933), quoting *Kelley* v. *Newburyport & Amesbury Horse R.R.,* 141 Mass. 496, 499 (1886). See *Puritan Med. Ctr., Inc.* v. *Cashman,* 413 Mass. 167, 172 (1992).

Ratification presents a question of fact. See *A.J. Armstrong Co.* v. *Bloomberg,* 285 Mass. 6, 9-10 (1933), and cases cited. Because GGNSC argues ratification, it bears the burden of proof. See *Lucey* v. *Hero Int'l Corp.* 361 Mass. 569, 572 (1972). The judge found that Rita "never did or said anything which would constitute ratification of [Salvatore's] act of signing the [arbitration a]greement," and GGNSC points to nothing in the

---

[6]As support for the claim that Rita's silence indicated passive assent to Salvatore's authority, GGNSC relies on opinions of the Alabama Supreme Court. See *Carraway* v. *Beverly Enters. Ala., Inc.,* 978 So. 2d 27, 30-31 (Ala. 2007); *Owens* v. *Coosa Valley Health Care, Inc.,* 890 So. 2d 983, 987 (Ala. 2004). To the extent these cases suggest that a patient may through silence alone consent to actions of which the patient lacks knowledge, we disagree.

record to support a contrary finding. It has provided no evidence that Rita ever learned of the arbitration agreement or that she "wilfully or deliberately ignore[d] the facts." *Kidder* v. *Greenman*, 283 Mass. at 615. See *See* v. *Norris*, 234 Mass. 345, 348 (1920), and cases cited (absent evidence that principal knew of agreement prior to bringing suit, "there is nothing on which ratification can be founded; nor in the absence of knowledge was there any duty of disaffirmance").

5. *Third-party beneficiary.* GGNSC argues also that the arbitration agreement bound Rita as a third-party beneficiary. We have adopted the rules concerning third-party beneficiaries set forth in the Restatement (Second) of Contracts (1981) (Restatement). See *Flattery* v. *Gregory*, 397 Mass. 143, 148 (1986); *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 195 (1982). Pursuant to the Restatement, *supra* at § 304, an intended beneficiary of a contract who was not a party to the contract may still sue to enforce the benefit. *Rae* v. *Air-Speed, Inc.*, *supra.* In receiving such benefits, the third party may also acquire obligations under the contract. See *Rae F. Gill, P.C.* v. *DiGiovanni*, 34 Mass. App. Ct. 498, 503 (1993) (noting that intended beneficiary may acquire "rights and burdens" under contract); Restatement, *supra* at § 302 comment a (acknowledging beneficiary's "rights and duties").

There can be no third-party beneficiary, however, in the absence of a contract. See Restatement, *supra* at § 304 comment b (for contract to create rights in third party, "[t]he requirements for formation of a contract must of course be met"); Restatement, *supra* at § 309(1) & comment a ("A promise creates no duty to a beneficiary unless a contract is formed between the promisor and the promisee . . . . [T]he right of an intended beneficiary is created by contract, and in the absence of contract there is no such right").

In the present case, no contract was formed because no one with authority to do so signed the arbitration agreement. Salvatore only purported to sign the arbitration agreement as Rita's "Authorized representative," and GGNSC makes no claim that he signed it in a personal capacity. Thus, the third-party beneficiary doctrine does not apply.[7]

---

[7] Courts in other jurisdictions likewise have refused to apply the third-party

6. *Equitable estoppel.* Finally, GGNSC contends that the doctrine of equitable estoppel precludes Salvatore from disavowing the arbitration agreement. GGNSC does not seek to establish the traditional elements of equitable estoppel. See, e.g., *Reading Coop. Bank* v. *Suffolk Constr. Co.*, 464 Mass. 543, 556 (2013), quoting *Bongaards* v. *Millen*, 440 Mass. 10, 15 (2003) ("To establish estoppel, a party must show '(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission' "). Instead, it argues that because Salvatore filed suit for breach of the admission agreement, he should be equitably estopped from denying the arbitration agreement. As support for this argument, GGNSC points to the purpose underlying equitable estoppel, namely to prevent "results contrary to good conscience and fair dealing." *Mc-Learn* v. *Hill*, 276 Mass. 519, 524 (1931). Another important principle, however, also animates the application of equitable estoppel. "The law does not regard estoppels with favor, nor extend them beyond . . . the transactions in which they originate." *Boston & Albany R.R. Co.* v. *Reardon*, 226 Mass. 286, 291 (1917), quoting *Tracy* v. *Lincoln*, 145 Mass. 357, 360 (1887). Salvatore's complaint sought enforcement of the contract to provide services, which was distinct from the separate agreement to arbitrate.[8] Thus, no inequity results from denying enforcement of the arbitration agreement.

*Judgment affirmed.*

beneficiary doctrine under similar circumstances, also relying on the rationale that the nursing home resident cannot be a third-party beneficiary of a non-existent contract. See, e.g., *GGNSC Omaha Oak Grove, LLC* v. *Payich*, 708 F.3d 1024, 1026-1027 (8th Cir. 2013); *Ping* v. *Beverly Enters., Inc.*, 376 S.W.3d 581, 596-597 (Ky. 2012), cert. denied, 133 S. Ct. 1996 (2013); *Dickerson* v. *Longoria*, 414 Md. 419, 452 (2010); *GGNSC Batesville, LLC* v. *Johnson*, 109 So. 3d 562, 565-566 (Miss. 2013).

[8]Although, as with the arbitration agreement, Salvatore only purported to sign the admission agreement on Rita's behalf, the merits of his contract claim are not before us. Therefore, we need not address issues regarding the validity of the admission agreement such as, for example, whether Salvatore had authority to sign it as Rita's responsible party or whether Rita ratified it by accepting nursing care.