NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1375                                    Appeals Court

 SCOTT R. BARROW, executor,[1]  vs.  DARTMOUTH HOUSE NURSING HOME,
                   INC.,[2] & others.[3]


                      No. 13-P-1375.

       Essex.     April 8, 2014.  -  August 18, 2014.

          Present:  Kafker, Brown, & Sikora, JJ.



Nursing Home.  Arbitration, Parties, Stay of judicial
     proceedings, Confirmation of award.  Contract, Arbitration,
     Parties, Validity, Third party beneficiary.  Agency, Scope
     of authority or employment.  Health Care Proxy.  Estoppel.
     Practice, Civil, Stay of proceedings.




     Civil action commenced in the Superior Court Department on
May 26, 2010.

     The case was heard by Robert A. Cornetta, J.

     John Vail, of the District of Columbia (David J. Hoey with
him) for the plaintiff.

_____

     [1] Of the estate of Elizabeth Barrow.  Scott R. Barrow is
Elizabeth Barrow's son, and her sole heir and beneficiary.

     [2] Doing business as Brandon Woods Long Term Care Facility.

     [3] Scott Picone; Barbara Silva; Samantha Duggan; Susan
Plante; Lucy Silveira; Laura Lundquist; and Essex Group
Management Corp.

Tory A. Weigand (Noel B. Dumas with him) for the defendants.

KAFKER, J.  The enforceability of arbitration agreements signed on behalf of family members being assisted in the nursing home admission process has been the subject of a recent constellation of cases.  See, e.g., Miller v. Cotter, 448 Mass. 671, 679-684 (2007); Johnson v. Kindred Healthcare, Inc., 466 Mass. 779, 781-789 (2014), and Licata v. GGNSC Malden Dexter LLC, 466 Mass. 793, 796-799 (2014).  Here, the plaintiff, Scott R. Barrow, signed such an arbitration agreement on behalf of his ninety-six year old mother, Elizabeth Barrow, as he helped her enter the Brandon Woods Long Term Care Facility (nursing home).  After she was allegedly beaten and strangled to death by her ninety-seven year old roommate, Scott[4] brought, in his capacity as executor of his mother's estate, a multicount suit in Superior Court.[5]  The Superior Court judge ordered all claims to arbitration.  The arbitrator decided all claims in favor of the defendants, and Scott appealed on the grounds that the arbitration agreement was unenforceable.

---

[4] We use first names to avoid confusion.

[5] He alleged negligence, lack of informed consent, and breach of contractual or implied or express warranties, and sought damages under the wrongful death statute, G. L. c. 229, § 2, as a result of the defendants' care of his mother.

We agree that the arbitration agreement was not enforceable and reverse the decision of the judge compelling arbitration. Scott did not have a durable power of attorney. Nor was he acting as his mother's guardian or conservator. A health care proxy, as the Supreme Judicial Court has previously held, is insufficient to authorize the health care agent to sign an arbitration agreement. There was no evidence or suggestion that Scott's mother specifically authorized him to sign the arbitration agreement. The agreement, by its express terms, was not a requirement of admission to the nursing home. We also conclude that Scott did not sign the arbitration agreement in his individual capacity and that principles of equitable estoppel do not preclude Scott from bringing suit.

Background. On February 16, 2006, Scott completed the admission authorization process for his mother at the nursing home. Elizabeth had requested that Scott complete this process prior to her arrival at the home, and she had informed the nursing home that Scott would be doing so. The admission process included executing numerous agreements, such as a consent for admission, a consent for treatment, a physician consent, and various others enumerated on a two-page "admission authorization" form.

In addition to these documents, Scott also signed a "Resident and Facility Arbitration Agreement" (agreement). The

agreement provided that "any legal dispute, controversy, demand or claim . . . that arises out of or relates to the Resident Admission Agreement or any services or health care provided by the Facility to the Resident, shall be resolved exclusively by binding arbitration." The agreement was not a condition of admission, and clearly stated as much on its face, in bold and capitalized print. It also was not listed on the admission authorization form. Scott signed and dated the agreement on the line for the "Resident Representative Signature," below a paragraph certifying that the signatory was "the Resident, or a person duly authorized by the Resident, which shall include a responsible party, Health Care Proxy, Power of Attorney, or Legal Guardian." Elizabeth did not sign the agreement, and she did not specifically authorize Scott to sign the agreement. According to Scott's affidavit, he never informed his mother that he entered into an arbitration agreement.

Around the same time that Elizabeth was admitted to the nursing home, she signed a health care proxy designating Scott as her health care agent, pursuant to G. L. c. 201D, § 5, in the event of her incapacity to make health care decisions. The proxy was witnessed on February 17, 2006, but was not activated. Aside from the health care proxy, Scott did not hold a power of attorney, and he was not Elizabeth's legal guardian or conservator.

Elizabeth died on September 24, 2009.  According to the complaint, Elizabeth's roommate at the nursing home attacked Elizabeth in their room, beating, strangling, and asphyxiating her by putting a plastic bag over her head.  Following Elizabeth's death, Scott filed this wrongful death action against the nursing home, its corporate owner, and various employees of the nursing home (sometimes, collectively, Brandon Woods) in the Superior Court as executor of Elizabeth's estate. The complaint alleged that his mother's roommate demonstrated a propensity for violence on numerous occasions while she was a resident at the nursing home, and that the defendants' failure to address these violent propensities resulted in Elizabeth's death.

Relying on the agreement that Scott had signed during the admission process, Brandon Woods moved to compel arbitration. Scott opposed arbitration based on his claim that he lacked actual or apparent authority to sign the agreement.  The judge entered an order compelling arbitration.  After various additional motions, proceedings, and orders -- including an order by a single justice of this court denying Scott's interlocutory appeal -- the parties proceeded to arbitration, where the arbitrator determined that there had been no wrongdoing by Brandon Woods.  The judge confirmed the arbitration decision and denied Scott's postarbitration motions

seeking to alter or amend the judgment and to vacate the arbitration decision.  This appeal followed.

Discussion.  "Adjudication of a motion to compel arbitration, including a challenge to the validity of the arbitration agreement, is governed by G. L. c. 251, § 2(a)." Johnson, 466 Mass. at 781.  "Such motions are treated akin to motions . . . for summary judgment."  Chambers v. Gold Medal Bakery, Inc., 83 Mass. App. Ct. 234, 241 (2013).  See Miller v. Cotter, 448 Mass. at 676.  Accordingly, the moving party -- here, Brandon Woods -- bears the burden of proving that the material facts are established and that it is entitled to arbitration as a matter of law.  See Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).  In the instant case, the key facts have not been disputed, nor has an evidentiary hearing been requested.  We therefore review de novo the judge's legal conclusion regarding the validity of the arbitration agreement. See Licata, 466 Mass. at 796; Chambers, supra at 241.  Our own legal analysis is guided by the Supreme Judicial Court's most recent decisions in Johnson and Licata.[6]

1.  Health care proxy and agency.  In Johnson and Licata, the court defined the standards for authorizing arbitration

---

[6] We note that neither the judge nor the single justice of this court had the benefit of the Johnson or Licata decisions, which were issued subsequently.

agreements and distinguished them from other forms of agency authority, including those governing health care proxies and the signing of ordinary nursing home documents. More specifically, the court held that a health care proxy alone is insufficient to provide authorization to sign an arbitration agreement. See Johnson, 466 Mass. at 781; Licata, 466 Mass. at 797. As the court explained, "the Legislature intended to distinguish between a health care proxy, which limits an agent's decision-making authority on behalf of an incapacitated person to health care decisions, and a durable power of attorney, guardianship, or conservatorship, all of which authorize broad decision-making power on behalf of an incompetent person, including over the person's financial interests and estate." Johnson, supra at 784-785. See Miller, supra at 681-682 (durable power of attorney is sufficient to authorize family member to sign arbitration agreement on behalf of principal). In the instant case, Scott held at most a health care proxy;[7] he did not have a power of attorney, and he was not a guardian or a conservator.

---

[7] The parties essentially treat the health care proxy as having been signed contemporaneously with the arbitration agreement, as part of the admission process. The timing of when Elizabeth actually signed the health care proxy is uncertain, as it may not have been signed until the day after Scott signed the arbitration agreement. Regardless, even if the proxy were signed prior to the arbitration agreement, it would not have been sufficient.

The court in Johnson and Licata also distinguished the authority to sign ordinary nursing home documents from arbitration agreements.  As the court stated, a "person's designation in a health care proxy may establish the individual's trustworthiness and familiarity with the principal and, therefore, enable the individual to sign many of the documents included in a nursing home's admissions package.  But it does not follow that such a person also can sign an arbitration agreement, which requires the power of an authorized fiduciary."  Johnson, supra at 789.

In addition to the health care proxy, however, we have here Elizabeth's relationship to Scott and her request that Scott complete the admission process prior to her arrival.  We agree that her parent-child relationship with Scott, and her request and representation that he act on her behalf in the admission process, further enhances his authority to act as her agent in the nursing home admission process.  See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000) (Theos) (agency relationship is created when there is mutual consent that agent is to act on behalf of principal and subject to principal's control).  "Even where an agent-principal relationship exists, however, the principal has liability for the agent's acts toward third parties only if the agent was acting with the actual or

apparent authority of the principal <u>in that transaction</u>."  <u>Id</u>.
at 743 (emphasis added).[8]

In the instant case, Brandon Woods has provided no evidence
suggesting that Elizabeth knew Scott was signing an arbitration
agreement as part of her admission into the nursing home or made
any representation to Brandon Woods to that effect.  She was not
in the room when he signed it.  See <u>Licata</u>, <u>supra</u> at 802.  It
was not a part of the two-page admission authorization form.
The agreement was not a condition of admission.  Finally, Scott
attested that he did not inform her of his signing of the
arbitration agreement.  On the factual record before us, Brandon
Woods has not met its burden of showing that signing the
arbitration agreement was within the scope of Scott's actual or
apparent authority to act on her behalf in the nursing home
admission process.  See <u>id</u>. at 801.  See also <u>Theos</u>, <u>supra</u> at
745; <u>Walker</u> v. <u>Collyer</u>, 85 Mass. App. Ct. 311, 323-325 (2014).

2.  <u>Third-party beneficiary</u>.  Brandon Woods's argument that
the arbitration agreement bound Elizabeth as a third-party

---

[8] Actual authority "is the agent's power to affect the
principal's relations with third parties as manifested" by the
principal to the agent.  <u>Theos</u>, <u>supra</u> at 743-744, citing
Restatement (Second) of Agency § 7 (1958).  Apparent authority
arises from "written or spoken words or any other conduct of the
principal which, reasonably interpreted, causes the third person
to believe that the principal consents to have the act done on
his behalf by the person purporting to act for him."
Restatement (Second) of Agency § 27 (1958).

beneficiary is similarly unavailing. "There can be no third-party beneficiary . . . in the absence of a contract." Licata, supra at 803, citing Restatement (Second) of Contracts §§ 304 comment b, 309(1) & comment a (1981). No contract was formed here because no one with authority to do so signed the agreement. See ibid. Although Brandon Woods argues that Scott may be deemed to have signed the contract in his individual capacity, this is contradicted by the intent of the parties as manifested by the terms of the agreement itself. See Constantino v. Frechette, 73 Mass. App. Ct. 352, 355 (2008). The agreement is plainly titled "Resident and Facility Arbitration Agreement," and in the first paragraph, the parties to the agreement are listed as "BWD [Brandon Woods Dartmouth]" and "Elizabeth W. Barrow." Scott only purported to sign the arbitration agreement as Elizabeth's "Resident Representative." The contract does not support a reading that either Brandon Woods or Scott intended that he sign the agreement in his individual capacity. See ibid. (nurses at care facility were not parties to contract between nursing home and resident where nurses were not named as parties and did not assume obligations under contract).

3. Equitable estoppel. Finally, Brandon Woods argues that we should apply equitable estoppel, as the judge did below, to hold that Scott is bound by the agreement. Equitable estoppel

may be raised where the defendant can prove that he was harmed because the plaintiff's conduct or representation induced him to do something different from what he otherwise would have done. See Boston & Albany R.R. Co. v. Reardon, 226 Mass. 286, 291 (1917). Nevertheless, "[t]he law does not regard estoppels with favor," Licata, supra at 804, quoting from Reardon, supra at 291, and estoppel is applied only to avoid injustice. See Reardon, supra at 291 ("[T]he doctrine of estoppel is not applied except when to refuse it would be inequitable"). "To establish estoppel, a party must show (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." Licata, supra at 804 (quotation omitted). See Harrington v. Fall River Hous. Authy., 27 Mass. App. Ct. 301, 308 (1989) (quotation omitted) (describing the elements of estoppel as follows: "first, a material misrepresentation of a party who had reason to know of its falsity; second, reasonable reliance upon the misrepresentation; and third, some disadvantage to the party seeking to assert estoppel fairly traceable to the misrepresentation"). See also Walker, 85 Mass. App. Ct. at 319.

The principles and elements of equitable estoppel neither require nor favor its application here. The flaw in Brandon

Woods's argument is that it points only to Scott's purported actions and alleged misrepresentations, and not to any act or omission of its own that was done in response to or in reliance of such actions.  Even if we were to accept, for the sake of argument, that the first element is satisfied by any of Scott's purported representations in signing the agreement, the second and third elements cannot be met on these facts.  Brandon Woods cannot show that any representations induced it to do something different than it otherwise would have done, as signing the arbitration agreement was not a condition of admission, and Brandon Woods does not argue that it would have treated Elizabeth differently in any other way if the agreement had not been signed.  Cf. Looney v. Trimount Theatres, Inc., 282 Mass. 275, 278-279 (1933) (lessee who was misled and disadvantaged by lessor's misrepresentation regarding title to property fixtures could assert estoppel where lessee had acted on misrepresentation by acquiring title to fixtures from another). Likewise, Brandon Woods does not attempt to show that it suffered any detriment as a consequence of Scott's purported representation.  Cf. Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722, 729 (1974), S.C., 368 Mass. 811 (1975) (plaintiff detrimentally relied on defendant company's representation that company would buy plaintiff's land where plaintiff broke off negotiations for land sale with other competitor companies).  As

such, we cannot say that application of equitable estoppel is necessary to avoid injustice here.

Conclusion.  We conclude that Scott did not have the authority to execute the arbitration agreement on his mother's behalf; he did not sign the agreement in his individual capacity; and equitable estoppel is not warranted on these facts.  Therefore, Scott, as executor of his mother's estate, shall be permitted to seek redress in court for Elizabeth's allegedly violent and unnatural death while in the defendants' care.  The judgment confirming the arbitration award is vacated, and the matter is remanded to the Superior Court for proceedings consistent with this opinion.

So ordered.