NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

15-P-310                                            Appeals Court

JOSEPH FERGUS  vs.  STEVEN A. ROSS.[1]

No. 15-P-310.

Suffolk.     January 21, 2016. - June 9, 2016.

Present:  Green, Wolohojian, & Henry, JJ.

Agency, Scope of authority or employment.

Civil action commenced in the Superior Court Department on August 31, 2010.

The case was heard by Frances A. McIntyre, J.

Arnold E. Cohen for the defendant.
Gordon E. Feener for the plaintiff.

WOLOHOJIAN, J.  We consider here a principal's liability to a third party for the conduct and representations of his agent in the context of a private lending transaction.  Following a bench trial, a judge of the Superior Court concluded that Steven A. Ross, individually, was bound by promises Bernard Laverty, Jr., made to Joseph Fergus because Laverty was Ross's agent and

_____

[1] Individually and as trustee of the Wisconsin Avenue Lending Trust.

acted within the scope of his apparent authority.  Judgment

accordingly entered against Ross, individually.  The central

issue on appeal is whether the judge erred in concluding Laverty

had apparent authority to bind Ross to act as closing agent on a

side loan about which Ross did not have actual knowledge.  We

affirm.

Background.  We summarize the judge's findings, which we

must accept unless clearly erroneous.  See Weiler v.

PortfolioScope, Inc., 469 Mass. 75, 81 (2014).  "A finding is

'clearly erroneous' when although there is evidence to support

it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed."

J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 792 (1986),

quoting from United States v. United States Gypsum Co., 333 U.S.

364, 395 (1948).  Where there are two permissible views of the

evidence, a judge's finding adopting one view is not clearly

erroneous.  See Pehoviak v. Deutsche Bank Natl. Trust Co., 85

Mass. App. Ct. 56, 65 (2014).[2]

_____

[2] It is primarily because of this well-established principle
that we disagree with our dissenting colleague.  We recognize
that the trial judge could have reached a contrary conclusion
about Laverty's apparent authority to act as Ross's agent.  But
we are not called upon to assess the evidence anew, nor are we
to substitute our own views of the witnesses' credibility or
thought processes for those of the trial judge.  Because the
evidence, and the reasonable inferences to be drawn from it,
permitted the trial judge to make the findings and reach the
conclusions that she did, it matters not that another judge

Fergus, a middle-aged man with an eighth grade education, is a public insurance adjuster also in the business of rebuilding damaged residential properties he comes across in his insurance work.  Fergus is savvy and smart, but he is not sophisticated about financial matters or perfecting security interests.  He had previously bought and sold several residential properties, financing them through conventional lenders.  Before the facts giving rise to this case, Fergus had never dealt with a private lender.

In the summer of 2007, Fergus required between $75,000 and $100,000 for the cosmetic work needed to complete the rehabilitation of a burned-out property on Ruthven Street in the Dorchester section of Boston.  Fergus could not obtain conventional financing on the property and so he contacted his cousin, Catherine Gibbons, a mortgage broker, to ask for her help.  Gibbons recommended Bernard Laverty, Jr., who had connections to several "hard money" lenders.[3]  One of those connections was Attorney Steven A. Ross, who ran a private lending practice at Gilmartin, Magence and Ross, LLC (GMR).  Laverty would bring Ross potential borrowers and if Ross "liked" them, he would make the loan and pay Laverty a referral fee.

---

hearing the same evidence might have reached a different conclusion.

[3] A hard money loan is typically a short-term, high-risk, and high-interest loan funded by private investors.

This arrangement began before the transaction at issue in this case and continued thereafter.  In addition, Laverty had himself borrowed money from Ross on five or six occasions in the past.[4]

At the same time, Laverty happened to need money to close on a property in Marshfield for which he had signed a purchase and sale agreement.  Therefore, he pressured Fergus to give him a side loan of $120,000 out of the proceeds of any loan from Ross.  To "protect[]" Fergus, Laverty offered to give him a "deed-in-lieu" on the Marshfield property.  Fergus's notion of the meaning of a deed-in-lieu was vague, but he understood that if Laverty did not repay the side loan, he would be able to sell the Marshfield house.  In Fergus's mind, he would be protected "either way."  On this basis, Laverty persuaded Fergus to borrow from Ross more money than he (Fergus) needed.  The side loan was to be for one month.

Laverty brought Fergus's need for a "hard money" loan to Ross's attention and, thereafter, there was no direct communication between Fergus and Ross.  Instead, all discussions with Ross were conducted by Laverty, outside of Fergus's presence.  Laverty was the sole conduit of information to and

---

[4] Laverty, a self-described real estate investor whom the judge considered likely to be a "flipper" (i.e., someone engaged in buying houses, rehabilitating them, and then reselling them at a profit), did not make a favorable impression at trial.  The judge described him as a man of dissolute and disheveled appearance.

from Ross and, according to Fergus, Laverty "set everything up." Laverty met with Fergus to discuss the loan terms, arranged (and was present for) the inspection of the Ruthven Street property by Ross's wife, delivered the commitment letter to Fergus, obtained Fergus's signature, and returned it to Ross.

As noted above, Ross's wife (who had been told that Fergus needed the loan to complete renovations) inspected the Ruthven Street property for Ross.  Based on that inspection, Ross knew or should have known that Fergus needed a loan of only $75,000 to $100,000 to complete the renovations.  Nonetheless, Ross set the amount of the loan at $260,000 -- more than twice what Fergus needed.  Fergus never requested a $260,000 loan; in fact, he never requested any specific amount.  The amount set by Ross was not a random figure.  It represented not only the $75,000 to $100,000 that Fergus needed, but also the $120,000 for Laverty's side loan, and the costs (which included prepaid interest, origination fees, appraisal fee, and legal fee) associated with the loan itself -- all of which came out of the loan proceeds at the time of closing.  Those facts, together with Ross's knowledge that Laverty was not receiving his customary referral fee, that Laverty could not be expected to expend time and energy without compensation, and that Laverty frequently borrowed money, permitted the judge to find (as she did) that

Ross could have easily deduced that Laverty was to receive a side loan from the proceeds of the loan to Fergus.

All paperwork for the loan was prepared by Ross. Among other things, Ross prepared and signed a commitment letter dated September 7, 2007, containing the terms of the loan. Laverty delivered that letter to Fergus on September 10, 2007, the day before the closing. Fergus signed the letter and gave it to Laverty to return to Ross. On the same day, Fergus handwrote, and signed, a letter to Ross, which Laverty represented he would deliver to Ross together with the signed commitment letter.[5] That letter reads:

"To Steve Ross.

"Bernard Laverty is getting $120,000 from the closing on Ruthven St. Roxbury.

"I'm authorizing the disbursement from tomorrow's closing on Ruthven St. so that you can write the letter.

"Thank you"

Fergus's intention in writing this letter was to instruct Ross to prepare the paperwork required for both the loan and the side loan. Laverty told Fergus that Ross "would take care of everything," that Ross would serve as the closing agent with

---

[5] The judge did not believe that Laverty gave Fergus's letter to Ross; instead, she believed that Laverty wanted written documentation of Fergus's intention to make the side loan.

regard to both loans, and that "everything [including the deed-in-lieu] would be prepared at [Ross's] office."

The following day, Laverty, who had assisted in setting up the closing, transported Fergus to Ross's office (to which Laverty had been thirty or forty times before) for the closing.[6] Ross manifested no surprise at Laverty's presence at the closing. Laverty remained throughout the closing, and encouraged Fergus to sign the closing documents. Those documents made no reference to the side loan, nor did the documents protect Fergus's interest in the side loan.[7]

---

[6] In accordance with his regular practice, Ross created a trust solely to fund the Fergus loan. Ross named Ronald Williams, "an apparent illusion," as the trustee. Ross's use of a straw suggested to the judge that "Ross and GMR sought the huge financial return from hard loans as were made to Fergus without taking on any liability, staying barely within the letter of the law." Ross's general modus operandi, the judge found, was likely designed to protect Ross and GMR from liability under the predatory lending laws. The loan to Fergus was in the amount of $260,000 for three months at an interest rate of 8.25 percent over prime, or 16.5 percent.

[7] Nonetheless, the judge found that Fergus anticipated that Ross would disburse the $120,000 to Laverty and secure a deed-in-lieu from him. Fergus believed that, as in a conventional closing on a conventional mortgage with an institutional lender, the lawyers would use escrows to make filings and disbursements in a fashion that would protect the parties. Fergus anticipated that Ross would hold the funds for Laverty until Ross received the deed-in-lieu from Laverty, and did not recognize the practical impossibility of that idea given that Laverty did not have present title to the Marshfield property. Fergus did not recognize that Laverty could not provide the security interest he promised

Fergus timely repaid the $260,000 loan, but Laverty never repaid the $120,000 side loan. Fergus has no practical hope or expectation of repayment from Laverty.[8]

After a bench trial, the judge found in Fergus's favor on his negligence claim against Ross.[9] Judgment entered in the defendants' favor on all other counts.[10] Since Fergus has not cross-appealed, the issues before us relate only to the negligence claim against Ross, individually.

Discussion. Ross argues that the judged erred in concluding that Laverty had authority, as his agent, to bind Ross to serve as closing attorney for the side loan. "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000).

_____

or that Fergus would be unprotected should Laverty fail to repay the side loan.

[8] Laverty has since gone into bankruptcy, and the Marshfield property that was supposed to secure Fergus's loan to Laverty has been transferred to a third party.

[9] The theory of negligence was that Laverty, acting as Ross's agent, bound Ross to act as closing agent on the side loan such that Ross had a duty to document the side loan in a manner that would protect Fergus's interest in it.

[10] Those were breach of contract, unjust enrichment, fraudulent misrepresentation, violation of G. L. c. 93A, and violation of G. L. c. 183C.

Here, ample evidence supported the judge's conclusion that Laverty was Ross's agent with respect to the $260,000 loan. See Haufler v. Zotos, 446 Mass. 489, 497-498 (2006). Ross used Laverty as his sole conduit of information to and from Fergus. Laverty arranged and was present for the inspection of the property, which was conducted by Ross's wife for Ross's purposes. Laverty had a prior (and subsequent) history of receiving referral fees for bringing borrowers to Ross for "hard money" loans. Laverty helped arrange the closing and was present at it. Ross's acquiescence to Laverty's presence at the closing is meaningful given Ross's claim that he did not know of the side loan. Accepting that claim as true, Ross should have been puzzled by Laverty's presence at the closing. Ross's lack of surprise therefore buttresses the inference that Laverty was present as Ross's agent.

"Even where an agent-principal relationship exists, however, the principal has liability for the agent's acts toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction." See Theos & Sons, Inc. v. Mack Trucks, Inc., supra at 743. A principal imbues his agent with apparent authority by "written or spoken words or any other conduct . . . which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person

purporting to act for him." Haufler v. Zotos, supra at 497 n.22, quoting from Neilson v. Malcolm Kenneth Co., 303 Mass. 437, 441 (1939). See Kanavos v. Hancock Bank & Trust Co., 14 Mass. App. Ct. 326, 331 (1982) (question of apparent authority turns on "how, in the circumstances, a third person . . . would reasonably interpret [the agent's] authority in light of the manifestations of his principal"). Apparent authority may arise from a variety of circumstances, including the manner in which the principal conducts his business. See Theos & Sons, Inc. v. Mack Trucks, Inc., supra at 745 n.15; Kanavos v. Hancock Bank & Trust Co., supra at 332. "Only the words and conduct of the principal, however, and not those of the agent, are considered in determining the existence of apparent authority." Licata v. GGNSC Malden Dexter LLC, 466 Mass. 793, 801 (2014).

Here, the judge found that Ross deliberately insulated himself from direct contact with Fergus, choosing instead to communicate solely through Laverty. Ross relied on Laverty to communicate Fergus's requirements for the loan. Similarly, he used Laverty to communicate the lender's requirements and terms to Fergus. Ross appeared to respond to Laverty's communications from Fergus and to acquiesce in Laverty's activities. Ross permitted Laverty to arrange the inspection of the property and to help arrange the closing. In sum, Ross entrusted Laverty to carry out many steps necessary to the successful completion of

the $260,000 loan.  Ross's conduct was sufficient to support the judge's conclusion that Laverty was acting with apparent authority as Ross's agent with respect to the $260,000 loan.

The record also permitted the judge to conclude that Laverty's apparent authority extended to the side loan.  It was Ross who established the amount of the loan -- and he knew or should have known, based on his wife's inspection, that it greatly exceeded the amount required by Fergus for renovations on the Ruthven Street property.  As the judge found, it would have reasonably appeared to Fergus that Ross increased the amount beyond what Fergus needed in order to accommodate the side loan.  Furthermore, Ross knew that Laverty was expending energy in connection with the loan even though Laverty was not receiving his customary referral fee.  There was no reason for Ross to think that Laverty would volunteer his services.  Furthermore,  Ross knew that Laverty frequently needed to borrow money for his various real estate projects.[11]

---

[11] The judge's finding that Ross could easily have deduced that Fergus was lending money to Laverty out of the loan proceeds was amply supported by her subsidiary findings that Ross knew that (1) Laverty, likely a "flipper" of real estate, frequently borrowed money in his line of business and had previously done so from Ross; (2) the amount of the Fergus loan set by Laverty and GMR was "inflated;" (3) he was not paying Laverty a referral fee in connection with the $260,000.00 loan; (4) Laverty was a businessman with no familial or partnership relationship to Fergus or charitable purpose; and (5) Fergus expended much energy to ensure the large loan to Fergus closed. In these circumstances, the judge could have found implied

On these facts, the judge was warranted in concluding that Ross's conduct caused Fergus reasonably to believe that Laverty had authority to bind Ross to act as closing agent on the side loan and to protect Fergus's interest in it. See DeVaux v. American Home Assur. Co., 387 Mass. 814, 819 (1983); Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 16-17, cert. denied, 522 U.S. 1015 (1997).

Ross's lack of actual knowledge of the side loan does not compel a different result. Ross admitted that within "two minutes," he should have realized that Laverty, a man he had done business with for several years, was a liability. Nonetheless, Ross placed Laverty, whose "very appearance was a sign of trouble," in a position from which he could and did cause substantial harm to Fergus. Having accepted the benefits provided by Laverty, Ross should bear the loss caused by him. Compare Kansallis Fin. Ltd. v. Fern, 421 Mass. 659, 665 (1996) ("A principal who requires an agent to transact his business, and can only get that business done if third parties deal with the agent as if with the principal, cannot complain if the innocent third party suffers loss by reason of the agent's act").

---

ratification by wilful disregard of the facts within Ross's possession. See Licata v. GGNSC Malden Dexter LLC, supra at 802, and cases cited.

Ross argues that, even if Laverty acted within the sphere of his apparent authority, Laverty's knowledge should not be imputed to him (Ross) because Laverty "acted fraudulently" and "engaged in an independent fraudulent act from which [Ross did] not benefit." Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 425 Mass. 63, 67 (1997). See Restatement (Third) of Agency § 5.04 (2006). Ross's argument depends on a finding that Laverty did not intend to repay the side loan. The judge, however, found to the contrary. The judge credited Laverty's testimony that he expected to repay the side loan within thirty days with funds he anticipated receiving in connection with the settlement of an unrelated case. The decision to credit this aspect of Laverty's testimony fell within the judge's purview as the finder of fact.[12] Moreover, the findings that the side loan was not against the interests of Ross and GMR, and in fact benefited them, were not clearly erroneous.[13] See GTE Prod. Corp. v. Broadway Elec. Supply Co., 42 Mass. App. Ct. 293, 299-300

---

[12] It is true, as Ross points out, that Laverty could not have provided Fergus with a deed-in-lieu for the Marshfield property at the closing on the loan to Fergus. This does not mean, however, that Fergus could not have been protected. As a condition to the side loan, Laverty could have been required to ensure that the deed to the Marshfield property would be properly escrowed at the subsequent closing on that property.

[13] The inflated loan amount led to higher interest payments to the beneficiaries of the trust, including Ross's brother-in-law, and higher origination fees payable to GMR.

(1997).  Accordingly, Laverty's knowledge of the side loan was chargeable to Ross.

Finally, we note that Fergus was an innocent third party who dealt in good faith with Ross through Laverty.  Fergus timely repaid the full amount of the loan, including the side loan, even though he had not been repaid by Laverty and had received no benefit from the side loan.  Moreover, the judge found that Fergus reasonably believed Laverty was authorized to act for Ross with respect to both loans.  In these circumstances, Laverty's knowledge can be imputed to Ross even if Laverty's actions were unknown to Ross and adversely affected him.  See Restatement (Third) of Agency, supra at § 5.04(a) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know . . . is imputed [to the principal] . . . when necessary to protect the rights of a third party who dealt with the principal in good faith").

For these reasons, we affirm the judgment in favor of Fergus on his negligence claim against Ross in his individual capacity.

                                        Judgment affirmed.

GREEN, J. (dissenting).  I respectfully dissent from the majority's conclusion that the evidence was sufficient to impose on Steven A. Ross liability for the actions of Bernard Laverty, Jr., regarding the side loan.  As the majority acknowledge, the trial judge found (with support in the evidence) that Ross had no direct knowledge of the side loan, and indeed from all appearances it appears that Laverty took great pains to conceal from Ross any information regarding the side loan.  To overcome that substantial barrier, the majority (and the trial judge) rely principally on two factors: (i) that the amount of the loan Laverty requested on Fergus's behalf exceeded the amount required for the renovations Fergus planned, and (ii) that Laverty did not receive from Ross his customary referral fee incident to the loan Ross made to Fergus.  In my view, neither factor, alone or in combination, is adequate to support the conclusion that, in transacting the side loan with Fergus, Laverty was acting within the scope of his authority as Ross's agent with respect to the loan from Ross to Fergus.  To the extent the trial judge "found" that Ross knew of the side loan (and it is not at all clear that she made any such finding),[1] it was without support in the evidence.

---

[1] The trial judge observed that "Ross' actual knowledge of the [side] loan may not be directly proven," and found specifically that at the closing, the side loan to Laverty was not discussed by Ross or in Ross's presence.  The closest the

First, it is wholly unremarkable that Fergus borrowed more money than his planned renovations required. Owners of real property commonly borrow funds secured by the property, even when they have no plans to perform renovations of any kind. Fergus was an investor in a variety of properties, and (for all Ross may have known) could have planned to use the additional monies to place a deposit toward purchase of another property, or to perform maintenance or repairs to another property -- or even to purchase a new car or take an exotic vacation. The majority cites no authority (and I am aware of none) for the proposition that a lender has a duty to inquire into the purposes to which a borrower plans to direct loan proceeds, or that failure to do so will charge the lender with constructive

_____

trial judge came to finding that Ross actually knew of the side loan is her comment that "I believe [Ross] may well have known that Laverty was borrowing funds from Fergus." Expressed in that fashion, it is less a finding that Ross knew of the loan than speculation regarding the possibility that he may have known of it. Later, the trial judge observed that "Ross could easily have deduced that Fergus was lending money to Laverty out of the proceeds of the loan." For the reasons that follow, to the extent the judge's comment amounts to a finding that a reasonable person in Ross's position, possessed of the information available to him, knew or should have known that Laverty had arranged for Fergus to lend money to him from the proceeds of the loan Ross made to Fergus, I believe it rests on speculation rather than evidence and, accordingly, is clearly erroneous.

notice that the borrower has entered into an otherwise undisclosed arrangement with the lender's agent.[2]

Nor, in my view, does the fact that Laverty did not receive from Ross his customary referral fee carry any substantial weight with regard to the question of his authority to bind Ross to the side loan. Again, for all Ross knew, Laverty might have arranged for compensation by Fergus, as a finder's fee, for the services Laverty performed in arranging the loan to Fergus from Ross.

To be sure, Fergus comes before the court in a highly sympathetic posture, having been the victim of a fraud perpetrated by Laverty against him. But the circumstances of the case do not place Laverty's fraudulent conduct within the scope of his agency or authority on Ross's behalf any more than if Laverty instead had persuaded Fergus (without Ross's knowledge) to use $120,000 of the loan proceeds to purchase the Brooklyn Bridge, swamp land in Florida, or stock in an Argentinian silver mine. Had Fergus made any inquiry whatsoever of Ross about the side loan at the closing, directed either to the documentation of the loan or of the collateral he had been

---

[2] Of course, a prudent lender might wish for its own benefit to obtain some explanation of the purpose for which a borrower is borrowing funds. That interest does not equate, however, into a conclusion that an unexplained request for funds, supported by the value of the collateral, is suggestive of an independent financial arrangement between the borrower and the lender's agent.

promised to secure it, the case would be entirely different.  As things stand, however, the majority concludes that Ross may be held responsible for Laverty's conduct toward Fergus in connection with the side loan, where the only common thread between the loan Ross agreed to extend to Fergus and the side loan Laverty persuaded Fergus to extend to him without Ross's knowledge was that the proceeds of the loan from Ross to Fergus served as the source of the funds Fergus lent to Laverty.